The State of Delaware, *ex. rel*, DAVID M. RICHARDSON *v.* WIL-
LIAM H. SWIFT, President of The Diamond Match Company.

*Mandamus—Jurisdiction of Court— When Granted.*

The writ of mandamus is an appropriate remedy for the enforcement of private rights
where there is no other adequate remedy. The right to use it must first be ob-
tained from the proper court, which has a discretion, but not an arbitrary dis-
cretion, in granting it.

A stockholder in a private corporation has such an interest in it and its affairs as will
entitle him to an inspection and copies of its books, papers and accounts on
reasonable and proper occasions, and when they become material to him as evi-
dence in a suit with another. When this right is denied him by the company,
or any of its agents having the custody of said books, there being no other
specific remedy, a writ of mandamus will issue to enforce the same.

A foreign corporation, holding property and doing business within this State, is con-
siderated and treated as a domestic corporation, having the same rights and pro-
tection in the carrying on of its business and enforcement of its contracts, and
being subject to the same duties and answerable to the same tribunals and in a
similar manner, as domestic corporations.

A non-resident stockholder of a foreign corporation, said corporation owning property
and doing business in this State, has a right to inspect and make copies of the
books of said corporation for use in a suit in another State, they being in the
custody of its president residing in this State, and is entitled to a writ of man-
damus for the enforcement of said right against said president, he being within
the jurisdiction of this court.

(*New Castle, February 17, 1885.*)

MANDAMUS.

This was an application by David M. Richardson, the relator,
a resident of Michigan and a stockholder in the Diamond Match
Company, a corporation of Connecticut, owning property in this
State, for a *mandamus* to compel William H. Swift, a resident of
this State, its president, who had possession of certain books and
papers belonging to the company, to allow relator to make copies
thereof.

These copies were wanted by Richardson for use in certain
legal proceedings in the State of Michigan, brought by him against
Christian H. Buhl and Russell A. Alger of Detroit, to restrain
them from selling certain stock of the Diamond Match Company,
which he claimed.

This stock had been pledged by Richardson to Buhl and Alger
in 1879, and 1880, to secure them against loss by reason of certain

indorsements on his notes and as sureties on his bond, under an agreement that Buhl and Alger were to receive a proportion of the net earnings of the stock, and not merely the dividends declared on the same; that on settlement no loss that might be charged on account of the purchase and sale by the company of other match factories should be taken into account; that the earnings were to be estimated from the trial balances of books of the company, and allowance to be made for loss or shrinkage in value of the property of the company, and consideration taken of the improvements made out of the earnings.

Richardson paid his notes and the bond was discharged, but Buhl and Alger refused to deliver the stock to him, claiming that there was still a large balance due them for net earnings of the company during 1881 and 1882. On their proceeding to sell the stock, Richardson brought a suit for an injunction against them, and for use in such suit applied to Swift, as president of the company, for copies of the books in order to show the true net earnings during that time and what deductions from the earnings were proper to be made on account of loss and shrinkage of the property, and what sum should be charged for improvements and expenditures necessary to be made in order to enable the company to make such earnings and profits.

Swift allowed Richardson to inspect the books, but refused permission to make copies; whereupon, Richardson applied to this court for a writ of *mandamus* to compel such permission.

It was stipulated that if the court should be of opinion that the writ should be granted, a peremptory and not an alternative writ should issue.

*W. C. Spruance, William M. Lillibridge* and ———— *Lothrop* for the relator:

I. It is a settled rule of law that shareholders or corporators are entitled, as a matter of right, to inspect and take copies of the books and papers of the corporation, at all reasonable times. They are the best evidence of the facts contained in them, and are equally the property of all the corporators.

*1 Redfield on Railways*, 227; *1 Dillon Mun. Corps.*, § 240;

*Rex v. Hostmen,* 2 Strg., 1223; *Gery v. Hopkins,* 7 Modern, 129; *Rex v. Shelley,* 3 T. R., 141, (1789); *Mayor v. Graves,* 8 T. R., 590.

II. Mandamus is not confined to matters relating to public rights or duties, or to public corporations, but is the appropriate remedy in many cases relating to private corporations.

*Woods on Corps.,* §464; *Rex v. Wildman,* 2 Strg., 880; *Am. Railway Frog Co.,* 101 Mass., 398, (1869); *St. Luke's Church v. Stack,* 7 Cush., 226; *State v. Goll,* 3 Vroom, (N. J.), 285; *Rex v. Worcester and Birmingham Canal,* 1 Mann. & Ry., 529, (1828); *Kentucky v. Dennison,* 24 Howard, 66 (1860); *Commonwealth v. Phœnix Iron Co.,* 23 Am. Law Reg., 388 (Sup. C. of Pa., 1884), and cases hereafter cited; *High Ex. Rem.,* §277; *Rex v. March,* 2 Burroughs, 999; *White's Case,* 2 Ld. Raymond, 1004; *Prieur v. Bank,* 7 La., 509; *State v. Chamber of Commerce,* 20 Wisc., 73.

III. The writ of mandamus will be granted to a corporator to enable him to inspect books and papers of the corporation in case such inspection is necessary in reference to some matter in dispute between him and other corporators, or between the corporation and its members.

*Angell & Ames on Corps.,* p. 647; *High Ex. Rem.,* Sec. 306, Secs. 308, 310; *1 Dillon Mun. Corp.,* Sec. 240; *Wood's Field on Corps,* Sec. 464; *King v. Lucas,* 10 East, 235 (1808); *Rogers v. Jones,* 5 Dowling & Ryland, 484 (1825); *Rex. v. Merchant Taylors Company,* 2 B. & Ad., 115 (1831); *People v. Cornell,* 47 Barb., 329; *People v. Pacific Mail S. Co.,* 50 Barb., 280; *People v. Lake Shore & Mich. R. R. Co.,* 11 Hun., (18 N. Y.) 1, (1877); *People v. Throop,* 12 Wend., 183.

Peremptory mandamus granted to a director and stockholder of a bank to compel the cashier to allow inspection of the books of the bank.

*Commonwealth v. Phœnix Iron Co.,* (In Sup. Court of Pa.), 23 Am. Law Reg., 388, (1884); *Burton v. Saddlers Co.,* 31 Law Journal, Q. B., 62; *Cockburn v. Union Bank,* 13 La. Annual, 289; *Martin v. Bienville Oil Works,* 28 La. Annual, 204.

Mandamus granted to a stockholder to inspect books and papers of the corporation.

*State v. Accommodation Bank,* 28 La. Annual, 874; *People v.*

*Walker*, 9 Mich., 330, 96 U. S., 79; *People v. Underdon*, 1 Howard's, N. Y., Prac. R., 247.

IV. The right of a corporator to mandamus to enable him to inspect books, &c., of the corporation is subject to certain reasonable qualifications, e. g., it will not be granted to gratify idle curiosity, or upon merely speculative grounds. *High Ex. Rem.*, Sec. 310; *Wood's Corps.*, Sec. 464; *Rex. v. Merchants Taylors Co.*, 2 B. & Ad., 115; nor unless the relator has made a proper demand on the proper parties having the custody of the books, &c., and was refused permission. *High Ex. Rem.*, § 310; *People v. Walker*, 9 Mich., 328; *Rex. v. Wilts Canal Co.*, 3 Ad. & El. 477.

V. It is not a good ground for refusing a mandamus that the books, &c., are books of account between the corporation and its stockholders, and therefore should be regarded as confidential, or that they *might* be used for purposes not strictly proper.

*Wood's Corps.*, § 464; *People v. Pacific Mail*, 50 Barb, 280.

VI. The directors of a corporation have no right to pass a resolution excluding one of its members from an inspection of its books, although they believe him to be hostile to the interests of the corporation; and such resolution furnishes no sufficient ground for an officer of the company, having the custody of books, refusing to allow a member to inspect the same.

*People v. Throop*, 12 Wend., 183; *1 Redfield on R.*, 228.

VII. Where an inspection of corporate books and records is sought, the writ should be addressed to the one actually having the custody of the books and records, even though he is merely a ministerial officer acting under the direction of others, as a bank cashier.

*High Ex. Rem.*, §311, §545; *Wood's Corps*, §466; *People v. Throop*, 12 Wend., 183.

VIII. This court has jurisdiction to enforce by mandamus the right of a stockholder to inspect and take copies of books and papers of a foreign corporation, in a case where such books and papers, and the person having them in his possession or custody, are within this State, and such corporation owns property in, and is engaged in carrying on business in this State.

*State of Nevada ex. rel. Curtis v. McCullough*, 3 Nevada, 202.

IX. Where a corporator has the right to inspect books of the company, he has also the right to make copies.

*Cotheral v. Brouwer*, 1 Seld. (N. Y.), 562.

X. Where the rule to show cause why a mandamus should not issue is too general, the Court will mould and restrict it so as to meet the justice of the case.

*King v. Leicester*, 4 Bar. & Cr., 891.

XI. An application for mandamus is addressed to the *judicial discretion* of the Court; but if a party shows himself entitled to the writ, and it is refused, a writ of error will lie.

*Wood's Corps.*, § 456; *St. Luke's Church v. Slack*, 7 Cush., 239; *Commonwealth v. Pittsburg*, 7 Norris, (Pa.), 66; *Commonwealth v. Fischer*, 3 Harris, (Pa.), 251.

*George Gray* and *Benjamin Nields*, for defendant :

This is not a proceeding against any property lying or being within this State. It is not in any respect a proceeding against " The Diamond Match Company," the corporation. It is not in any sense a proceeding *in rem*, but is essentially a proceeding *in personam*.

No valid judgment or order *in personam*, can be pronounced or made by any judicial tribunal, until it has first obtained jurisdiction of the person against whom the judgment is pronounced or made, and such jurisdiction can only be obtained by the ordinary process of the Common law, or what is equivalent thereto, in our State Constitution, " remedy by due course of law."

Before the writ prayed tor or before any personam can lawfully issue, this court must have jurisdiction of the person against whom it does issue, viz: William H. Swift, President of The Diamond Match Company.—That this court can have jurisdiction by proceeding *in personam* over William H. Swift, as an individual, by *due course of law*, we do not deny. But that it can have jurisdiction over William H. Swift, as an officer of The Diamond Match Company, a corporation created and existing under the laws of Connecticut, unless he voluntarily submits to its jurisdiction, we do deny.

A corporation does not exist until created by positive law.

It exists only by form of law. When created its rights are only such as the power creating it may confer upon it. It owes its vitality to a legislative act, and its life, or duration continues only so long as the law of the State creating it may determine that it shall continue.

Trustees of Dartmouth College v. Woodward, 4 Wheaton, 518, 636.

All corporations are created in theory for the benefit of the general public of the State creating them,—for the public good of the State.

"The objects for which a corporation is created are univer-"sally such as the government wishes to promote. They are "deemed beneficial to the country ; and this benefit constitutes the "consideration, and in most cases, the sole consideration of the "grant."

Trustees of Dartmouth College v. Woodward, 4 Wheaton, 518.

No State, excepting the State under whose laws the corporation was created and exists, can enlarge or diminish the rights, powers or properties which the charter of its creation confers upon it, nor renew, or continue its vitality in a foreign State after its charter has been extinguished in the State creating it.

"A corporation can have no legal existence out of the Sovereignty by which it is created, as it exists only in contemplation of law, and by force of the law; and when that law ceases to operate, and is no longer obligatory, the corporation can have no existence. It must dwell in the place of its creation, and cannot migrate to another sovereignty. But although it must live and have its being in that State only, yet it does not follow that its existence there will not be recognized in other States."

Runyan v. Coster, 14 Peters 122-128 ; Bank of Augusta v. Earle, 13 Peters 519-588.

"It may be safely assumed that a corporation can make no contracts, and do no acts either within or without the State which creates it except such as are authorized by its charter ; and those acts must also be done by such officers or agents, and in such manner, as the charter authorizes."

Baily v. Phila. ; Bank of Augusta v. Earle, 13 Peters, 519-588.

*Blackstone Manufacturing Co. v. Inhabitants of Blackstone*, 13 Gray, 488.

The Act of the General Assembly of Delaware did not make the Diamond Match Company a Delaware corporation. The Act is as follows:

AN ACT TO ENABLE THE DIAMOND MATCH COMPANY TO HOLD REAL ESTATE.

Sec. 1. Be it enacted by the Senate and House of Representatives of the State of Delaware in General Assembly met: That the Diamond Match Company, a corporation of the State of Connecticut be, and it is hereby authorized to take and hold in fee simple, in New Castle county, and State of Delaware, such real estate as may be necessary for the purpose of carrying on the business of the said corporation, and also to sell the said real estate, or any portion thereof in fee simple when no longer needed for the said corporation. Passed March 8, 1881. (Private Act Record B, 1, 504).

It is an enabling Act and renders the corporation no further amendable to the laws of the State, nor entitled to its privileges, than any other foreign corporation.

*Blackstone Manufacturing Co. v. Inhabitants of Blackstone*, 13 Gray, 488; *Merrick v. Van Santvoord*, 34 N. York, 218.

This corporation cannot be sued in Delaware, nor any action taken against it in this State, excepting such action as is provided by the statutes of this State.

*McQueen et. al. v. The Middletown Manufacturing Company*, 16 Johns, 5; *Pickham v. North Parish in Haverhill*, 16 Pickering, 274-286; *Hulbert v. The Hope Mutual Insurance Co.*, 4 Howard P. R. N. York, p. 276; *Barrett v. Chicago and Lake Huron R. R. Co.*, Supreme Court, 4 (Hun.) Rep., 114; *Whitehead v. Buffalo and Lake Huron R. R. Co.*, 18 Howard P. R. N. York, 218.

The law of Connecticut requires that the town within the State shall be named, in which the corporation is to be located. Under and pursuant to that law, " The Diamond Match Company " is located in the Town of New Haven, County of New Haven, and State of Connecticut.

*McCall v. Byram Manf'g Co.*, 6 Conn., 428 ; *Statute of Conn.*, 1881.

The law further designates the officers of the corporation on whom notices, in legal proceedings, may be served. Service on the President, within the State of Connecticut, would not be a legal service on the corporation.

The law commands that the *statements* and *books* of every such corporation shall be kept in the town where it is located, &c. Which books and statements, we submit, must include and show all of the transactions of every nature and kind relating to the business of the corporation, including those named in the relator's petition, and all of these statements and books pertaining to the business transactions of this corporation are at New Haven, there open for the inspection, at all reasonable times, of David M. Richardson, and of the other stockholders. Under the terms of the law, they cannot be at any place, other than New Haven, for the purpose of inspection. If they are not there, then a law of the State of Connecticut has been violated, and the State of Connecticut has provided by law a penalty for such violation, and the courts of that State and that State alone, can impose the penalty prescribed by the act, or administer such other remedy or relief as the laws of that State may make appropriate. This Court will certainly not attempt to enforce a law of Connecticut relating to and governing a corporation of that State, nor will it impose on such corporation the provisions of any other law than that under which it exists, and is controlled.

It may, however, be contended that William H. Swift, as President of this corporation, having certain books, instruments, papers, &c., in his custody, that such books, &c., are property of the corporation within the jurisdiction of this Court.

The answer to such contention is, that such books, instruments and papers have no commercial or market value, and are not such property of a foreign corporation as the courts will intervene to protect for the benefit of creditors, and that the Courts will only intervene to protect the property of a foreign corporation for the benefit of the citizens of a State within which a foreign corporation has been transacting business respecting contracts *made in such States with such corporation* relative to such property, and when such

citizens would be remediless in the State where such corporation exists.

And further, this is not, as before stated, in any sense a proceeding against the property of this corporation—a proceeding *in rem*, nor is it a proceeding against the corporation to require *it* to comply with any law of its charter, or keep any promise, or perform any contract or agreement.

The relator, David M. Richardson, is not a citizen of this State; he owes no allegiance to this State; he is not here claiming that because this State enabled this corporation to hold land here, and by comity allows it to transact business here, and that he, as a citizen of this State, would be injured; he is not seeking to enforce any contract in this State; is not a creditor of this corporation; is not seeking to make any property of this corporation applicable to the payment of any claim or debt he has against it, but is asking this Court to command the president of this corporation, to permit him, here in Delaware, to examine and make copies of its books and papers, when he has a full and complete remedy in the State of Connecticut, where the corporation exists. And we respectfully submit, that if he has not a remedy under the laws of Connecticut, then this court has not the power to supply him with one.

*Howell v. Chicago and Northwestern Railway Co.,* Barbours, R., vol. 31, 378.

In England, a writ of Mandamus is, in general, a command issuing in the King's name, from the court of King's Bench. 3 Blk., 110.

In the United States, it may be defined to be a command issuing from a common law court of competent jurisdiction, in the name of the State. H. Ex. leg. R., 4.

It is directed to,

1st, Some corporation or,

2d, Some public officer or,

3d, Inferior Court,

*requiring*

The performance of a duty therein specified, which duty results from,

1st, The official station of the party to whom the writ is directed or,

2d, From operation of law, *i. e.*, obligations imposed by law upon the respondent specifically.   Ibid, 4.

*Cannon, et al., v. Janvier,* 3 Houston, 27.

A Mandamus does not confer power, but merely enforces the exercise of power already existing, where its exercise is a duty.

*Boone on law of Corporation,* Sec. 156.

Mandamus is a writ commanding the performance of some act or duty therein specified in the performance of which the applicant for the writ is interested, or by the non-performance of which he is aggrieved, or injured.   It is always to do some act in execution of law.   The object of a mandamus is to prevent disorder from a failure of justice and a defect of police.   High, 4.

*Legget, et al., v. Mayor, &c., of Annapolis,* 42 Md., 226.

To entitle a party to the writ of Mandamus, two things must appear ; first, that he has a legal right to have something done by the party to whom ·he seeks to have the writ directed, and which has not been done ; and, secondly, that he has no specific legal remedy to which he can resort to compel the performance of that duty.

It must also appear that the defendant yet has it in his power to perform the duty required of him.   For the Court will refuse the writ if it be manifest that it would be vain and fruitless.

*The People ex rel. Alexander H. Bailey v. the Supervisors of Greene,* 12 Barbour's Supreme Ct. Rep., 217.

But as simply a preventive remedy, it has never been used, so far as we have been able to discover.   The nature of the writ, and the end for which it was framed, direct upon what occasions it should be used.   It was introduced to prevent disorder from a failure of justice and defect of police.

*Legget et al. v. Mayor, &c., of Annapolis,* 42 Md., 226 ; *People ex rel. Mott v. Bond,* Sup. 64, N. Y., 600–604; *People v. Croton Aqueduct Board,* 49 Barbour, 259–564.

What are the duties of the President of this corporation ? Nowhere does the law require him to take charge of the books and papers pertaining to the business of the corporation.   Nowhere does it make it the official duty of the president to exhibit the

books and papers of the company to the stockholders. It is no part of his official duty to take charge of these books and papers and exhibit them to the stockholders of the company.

If the fact should appear that the books are in the hands of the wrong man, and are at the wrong place, then no Court can compel the person thus holding them to perform an official act in relation to them, that is, exhibit them to the stockholders of the Company, &c.

The rule is that the writ shall be directed to him who is to do the thing required to be done.

*The People v. Throop,* 12 Wend., 183.

The office of the writ is to compel the performance of a duty enjoined by law, and it cannot be employed to compel the doing of an act which the person, or officer, has no legal right to do, without the writ. It neither confers power, nor imposes duty, but it is a command to exercise a power already possessed, and to perform a duty already imposed.

*Lowe v. Phelps, Court of Appeals of Kentucky,* 8 Reporter, 498; *Reporter,* Vol. 12, p. 227.

If William H. Swift, as President of the corporation, should attempt to take the books and papers, named in this petition, from the town of New Haven to Detroit, there to exhibit them on this suit, the courts of Connecticut could lay hands on him, and prevent him from doing any such thing.

It has often been said by Lord Mansfield that a mandamus was a very beneficial writ, and the best method of preserving it, was to be sparing in the use of it.

*King v. Bristow,* 6 Term, 1795.

The writ can only properly issue to command the doing or performing some act or duty in execution of a legal obligation.

*Tappeng on Mandamus,* p. 10.

A mandamus will not be granted to command any person to exercise a jurisdiction which that person is not most clearly and certainly *appointed to,* and bound by law to exercise (*Rex v. Middlesex,* 9 A. & E., 540), for the court will not grant such writ, except it clearly see that there is a power lodged in the person against whom the mandamus is prayed.

*Tappeng,* p. 11, 12, 17, 131, 132; *King v. Blear,* 4 B. & C.,

901; *Rex v. The Gov. Comp. Bank of England*, 2 B. & Ad., 620; *The People v. Thump*, 12 Wend., 181–183; *Sellers v. Phœnix Iron Co., Am. Law Reg.*, June, 1884.

When the law does not provide for the inspection, the Courts have not the power to demand an inspection.

If the Court abide by the rules of pleading, then the absence of all pretense that there is any duty imposed by law, charter, or by-law, on William H. Swift, President, is admitted, because it is no where averred to exist. No specific duty by charter, and no statute giving the right as against him, are anywhere mentioned, in the relative petition, or his exhibits.

If it is the right of this relator to have these books and papers exhibited to him, that he may inspect them and make copies of them, then we submit that it is a corporate, that it is the duty of the corporation to produce them, and that this proceeding should have been against the directors and officers of this corporation, and not against an individual member of it. In the case of *Sellers v. Phœnix Iron Co.*, the petitioners had to amend their bill in order to make the directors and officers parties.

At law, contradistinguished from equity, it is a universally recognized rule that a corporator has no other rights in the property of the corporation or in its management than is given by the charter.

If the writ is of grace, then of course a reasonable ground must be laid. That this must be a *corporate* duty, if the right exists, is shown thus.

If the charter or by-laws do not require some particular officer to do the act, then if it is an act that must be done, the writ goes against the corporation and not against any officer, even though when the act is done, it must be done by some person.

2 Salk., 700; 1 Strange, 55; *Phillips v. Comth.*, 98 Penna., 401; 10 *Howard Pr. Rep.*, 542; *The People ex rel. Jenkins, &c., v. The Parker Vein Coal Co., &c.*

HOUSTON, J.:—On the facts alleged and not disputed in this case, I have no doubt upon the general principle involved in it, and the authorities cited in support of it, both in this country and in England, that a stockholder in any joint-stock company, or pri-

vate corporation incorporated for manufacturing or trading purposes, has such an interest in it and its affairs, as will entitle him in law to an inspection and copies of its books, papers and accounts on reasonable and proper occasions, and when they become material to him as evidence in a suit with another, and this right is denied or refused him by the company or any agent or officer of it having the custody of them, and there is no other specific remedy for it, the right may be enforced by a writ of mandamus from any court having jurisdiction and authority to issue the writ in such a case.

Originally in England, from which country we have derived it in this State, it could only be issued by the Court of King's Bench, and is thus defined by Lord Mansfield : "It was introduced to prevent disorder from a failure of justice and defect of police. Therefore it ought to be used upon all occasions when the law has established no specific remedy, and where in justice and good government there ought to be one." "If there be a right, and no other specific remedy, this should not be denied." *Rex v. Baker et. al.* 3 Burr., 1265. And the fact that by the recent Common-Law Procedure Act, 17 and 18 Vict. c. 125, it is provided that any party requiring any order in the nature of specific performance, may commence his action in any of the Superior Courts of Common Law in Westminster Hall, except in replevin and ejectment, and may indorse upon the writ and copy to be served that he will claim a writ of mandamus, and may renew the claim in his declaration, and if the writ is awarded in the final judgment in the case, it will issue peremptorily in the first instance, certainly shows that it has lost none of its importance and utility in the estimate of later times. The form of this statutory mandamus is very brief, and its execution is enforced by attachment.

By the second clause of Section 3 of Article 6 of the Constitution of this State, it is ordained that the Superior Court shall have jurisdiction of all causes of a civil nature, real, personal and mixed, at common law, and all other the jurisdiction and powers vested by the laws of this State in the Supreme Court or Court of Common Pleas which were wholly superceded by it under the present amended constitution, and by statute, it is also provided that the Judges of the Superior Court, or any two of them, shall hold pleas of assize, *scire facias*, replevins, information and actions

on penal statutes; and have and determine all and all manner of pleas, actions, suits, and causes, civil, real, personal and mixed, according to the Constitution and Laws of this State, as fully and amply, to all intents and purposes as the justices of the King's Bench, Common Pleas, and Exchequer in England, or any of them, may or can do.     *    *    *    *    *     And generally shall minister justice to all persons, and exercise the jurisdictions and powers hereby granted them, concerning the premises, according to law and equity, as fully and amply, *to all intents and purposes whatsoever*, as the justices of the King's Bench and Common Pleas, at Westminster, or the Chancellor of England, may or can do. *Revised Code Amended,* Chap. 92, Secs. 1 and 2, p. 564. And it is under these comprehensive grants of jurisdiction and powers that this court is vested with authority to issue and enforce the writ of mandamus in this State, as it existed at common law and was recognized by the Court of King's Bench in England, and for the like purposes of remedial justice when the grants were so made.

Its original quality or characteristic of a prerogative writ upon the theory that it proceeded immediately from the King himself by virtue of his peculiar sovereignty in such a case, never could have existed in this State under any constitution adopted by it, and therefore, it at once became in this State a common law writ in relation to the particular cases to which it was applicable, a writ of right, but not of course, because it could only be obtained and sued out on a special application to the court in term time on a statement of the case supported by affidavit and *prima facie* sufficient to entitle the applicant to the remedy afforded by it; and which was also originally the case with even that still more valuable and important writ of right, the writ of *habeas corpus* at common law, until by the great Statute of Charles II, made it issuable at any time, in vacation as well as term time, although it must still be specially applied for and supported by affidavit when made to the court in session or to a judge of the court in vacation.

This case, however, has been to me a novel and more embarrassing one on account of another aspect in which it has been so cogently presented to us by the counsel for the defendant, and that is, that with all the power vested in this Court to issue this writ

within the limits of this State and against any officer of a joint
stock corporation chartered by the State and holding his office and
residing in it, in such a case as this, we have no power to issue it
against the defendant in this case, the President of the Diamond
Match Company, because it was not incorporated by the Legisla-
ture of this State, but by the Legislature of the State of Connecti-
cut, notwithstanding it is admitted by them on the record that he
is the President of the Corporation and resides in this State and
city, and has in his possession and custody as such, the books and
papers of the Company in question, and has refused on his demand
therefor to allow the plaintiff to inspect and take copies of them,
and that such residence of the President in this State is not incon-
sistent with the charter of the corporation of the law of Connecti-
cut, and that his refusal to allow the plaintiff to inspect and take
copies of the books and papers of the company in his possession
and custody as such in this State is expressly sanctioned and ap-
proved by the corporation. It is also admitted that the corporation
has been and is still doing business in the manufacture and sale of
their friction matches in this city, and has even been directly recog-
nized as such a corporation of the State of Connecticut lawfully and
rightfully pursuing the business in the State, by a special act of
the Legislature of this State, passed on the 8th day of March,
1881, as follows: " That the Diamond Match Company, a corpo-
ration of the State of Connecticut, be, and it is hereby, authorized
to take and hold in fee simple, in New Castle county and State of
Delaware, such real estate as may be necessary for the purpose of
carrying on the business of the said corporation, and also to sell
the real estate, or any portion thereof in fee simple when no longer
needed for the said corporation." It is neither allowable or neces-
sary, I think, to consider that this made it in effect a corporation of
the State of Delaware. All I mean to say on this point is that it
constitutes an express recognition, not only of its existence as a
corporation of the State of Connecticut, but also of its right, as
such, to hold real and personal property in this county and to carry
on its business in this State; and that the company therefore enjoys
these corporate rights and privileges within our limits, not by that
implied recognition and comity merely which now prevails so gen-
erally among all the states of the Union with respect to such cor-

porations, but by the express grant of the Legislature of the State.

But of the right of the relator to the evidence which, as a member and stockholder in the corporation, he seeks to obtain within the limits of this State, for the vindication of his rights and the due administration of justice in a suit between him and others in another of our sister States be conceded, as I think it must be, what is there in the nature of the writ of mandamus as it exists, and has always existed in this State under the laws and constitution of it, that forbids this court under the facts and circumstances presented in this case, to order the issuing of it, provided the court is satisfied that there is no other specific remedy for the legal enforcement of that right? The answer to this question by the counsel for the defendant is not sufficient in this case in my opinion, because it proceeds, I think, upon an erroneous idea that there still inheres in the nature of the writ under our laws and constitution, such a peculiar quality or restriction, that it can only issue in such a case as this to a corporation or an officer of it under the law which created it, and in the name of the State which incorporated it, or, in other words, that no other judicial tribunal than the appropriate court in the State of Connecticut under the laws of it, can issue the writ to this corporation, or any officer of it, for any such purpose. For if that be so, then it is manifest whatever may be the legal right of the relator to the inspection and copies of the books and papers and papers in question, that he is wholly without any specific remedy in law to enforce it here or elsewhere; because it is equally certain whether we consider it a proceeding *in rem* or *in personam*, or as partaking of the nature of both, as the writ is to be specifically executed when issued, and both the custos and the books and papers are in this State, that they could not be reached by such a writ from any court in the State of Connecticut. And although that State may have the power which this has not, to forfeit or revoke the charter of the corporation, and that should be done by it, the relator would still be left without his specific remedy in the case, either there or here.

Although our constitution declares that "the style in all process and public acts shall be the State of Delaware," and the writ is issued and prosecuted in the name of it on the complaint of the relator, the jurisdiction and authority of this court to issue it in

such a case, even if this company were a domestic, instead of a foreign corporation, would not eminate or result from the act of incorporation or the by-laws of the company, but from that higher jurisdiction and authority which, as I have before said, the constitution and laws of the State have conferred upon the court in such a case and over the writ of mandamus and all other well known writs at common law within the limits of the State. And we may therefore admit the correctness of the definition of the writ cited by the counsel for the defendant from Mr. Potter's work on corporations, Vol. 2, Sec. 634. "That the writ issues by the command of the sovereign power, and in the name of the State, and is directed to some subordinate court, judicature or body within the jurisdiction of the court from which it issues, and it requires the performance by the body to whom it is directed of a specific act, as being the legal duty of the office, character or situation," without impairing in any degree whatever the truth and soundness of this proposition.

Well now if such be the general and fundamental principles of the law applicable to such a case, and the President of this corporation is residing in this State and City, and where it is now carrying on to some extent its corporate business, and has the books and papers of it in question in its possession and custody now in this State and within the jurisdiction of this court, and refuses to allow the relator to inspect and take copies of them for the purpose demanded of him, I am not able to perceive, after all the consideration which I have been able to give to the case, any good and valid reason for holding that the case is not within the jurisdiction of the court, or that it ought not under all the facts and circumstances alleged and not disputed in it, to award the writ, as prayed in the petition of the relator. The right of the relator to the inspection and copies which he demands being a right founded on the common law of the State by virtue of his being a stockholder in this corporation, and the res, or books and papers, as well as the corporate custos of them, being within the jurisdiction of this court, and the same principle of the common law which confers that upon the former, imposes the duty on the latter to grant it, on what principle of law or reason can it be said that the case is nevertheless not within the jurisdiction of the court, because the company was not

incorporated under a law of this State, but under a law of the State of Connecticut, although that right and that duty exists in both States by a law broader and more general than the act under which it was incorporated ?

Notwithstanding the number of cases to which we have been referred by the counsel on both sides in the argument of the case, but two have been cited, one on either side, in which this particular question appears to have been involved, and which seem to be conflicting in their rulings upon it. The first to which I shall refer is the case of *The People ex. rel. Jenkins, &c. v. The Parker Vein Coal Co., &c.,* 10 How., Pr. Rep., 543., before Mitchell, Morris and Clerke, Justices, in the Supreme Court of New York, on appeal from an order of special term refusing mandamus. The Parker Vein Coal Company, the defendant, was an incorporation of the State of Maryland. Its charter created it a corporation for the purpose of working mines of coal and iron, and for vending the proceeds of the same, and gave it power to make by-laws and all such rules and regulations as might be necessary for the proper management of its affairs. The capital stock of the company was not to exceed three millions of dollars to be divided into shares of one hundred dollars each, being thirty thousand shares. The officers of the company had issued one hundred and fifty thousand certificates of shares of stock, being one hundred and twenty thousand more certificates of shares of stock than the company by law was permitted to issue, and purporting to represent twelve millions of dollars more capital than the company possessed, or could possess as established and limited by the law of incorporation. In June, 1854, the company was insolvent and made an assignment to Romaine & Darrow of all their property of every description for the benefit of creditors. The plaintiffs were partners engaged as brokers in the purchase and sale of stocks for themselves, and for account of other persons, and had standing in their names upon the books of the company several hundred shares of the capital stock, of which they were the legal holders and owners, and they also held stock certificates in the usual form issued for a large number of its shares of capital stock and signed by its proper officers, of which they were also the legal holders and owners. One of the by-laws of the company required a book or books to be kept

by the company for the transfer of its stock. The corporation had a principal office in the City of New York, and had kept, and then kept at that office books for the transfer of its stock. At the last election of directors of the company, which was after the assignment in June, 1854, the defendants in the cause were elected directors and officers and then had charge of the books; and about the 3d of June, 1854, the officers and directors closed their transfer books, and since that they had refused to permit transfers therein of any of the shares of the capital stock. It was impossible from an inspection of the certificates of the stock to designate which were the genuine, and which were the over-issue certificates. The plaintiffs had applied to the officers and directors to be permitted to transfer stock to persons to whom they had sold it, and had been refused access to the books; and they claimed that the refusal to permit transfer upon the books was of great detriment to them and their business, was injurious to the company and its stockholders, and depressed the market and the intrinsic value of the stock; and they asked for a mandamus to compel the defendants to open the transfer books to them, and to all other stockholders who might desire to transfer stock.

The plaintiffs insisted that it was not denied that their certificates were a portion of the thirty thousand genuine certificates, and also suggested that the one hundred and twenty thousand over-issue certificates having been issued by officers of the incorporation who were authorized to issue certificates of stock, should be deemed genuine certificates.

*Morris, J.,* in delivering his opinion in the case, and after commenting in the strongest terms on the invalidity and illegality of the fraudulent certificates of stock issued by the directors and officers of the company, and observing that if the books should be opened for the transfer of stock, the one hundred and twenty thousand fraudulent certificates could be indiscriminately transferred with the thirty thousand genuine certificates upon the books of the company, and would greatly confuse the evidence in relation to both classes of them, and make it more difficult to trace the false certificates, and to discriminate between the genuine and the spurious, and would enable holders of the false certificates with greater facility to put them in circulation and deceive the ignorant

and confiding, *held*, that the order of the special term before them on appeal should be affirmed and the writ of mandamus denied with costs. And according to the report of it, this seems to have been the ground on which the majority of the three judges decided the case; but *Mitchell, J.,* who concurred in the decision, also announced his opinion in which he held that the plaintiffs were not entitled to the writ because they had an adequate remedy in an action on the case against the company for damages, and he cited several adjudged cases in his own State to show that such a remedy would be effectual and could readily be obtained for the injury complained of, and he then added, " There is also another difficulty in this application. The mandamus partakes of the character of a public writ, one in which the people are in some way interested; and it has never been allowed except for the purpose of controlling those who owe a public duty to the State in which it issued. This company was incorporated in Maryland ; and although it has an office here, and may be sued here on its contracts and obligations to individuals, or others, yet it does not owe allegiance or public duties to this State, or according to the laws of this State, but to the State of Maryland, and according to the laws of that State. If it violates its charter, the remedy should be in Maryland and not here. On *quo warranto* its charter could not be taken away here; and while it does not violate any law of our State, the State should not interfere with it." This, however, as it was but the opinion of one of the three members of the court, according to the report of it, the case cannot be considered an authority on that point; nor in any authority cited by him in support of it. But is it not a radical error to assume that because the courts in one State have not the power to proceed by a writ of *quo warranto* to forfeit the charter of a corporation of another State for a violation of it, they have not the power to issue a writ of *mandamus* against it for the specific enforcement of a legal right of a member of it against the corporation, when he has no other specific or adequate remedy for it, and they have by virtue of their general powers, jurisdiction and authority to issue and enforce a writ of mandamus against it in such a case in their own State? It is not by virtue of any obligation of allegiance that a natural person or a corporation may owe to the State of his birth or its creation even, that they are

bound to obey, and are subject to the laws of it, when questions of legal rights and liabilities arise between them and others in courts established for the administration of justice. Although it is denominated a prerogative writ, and must be specially applied for and sufficient grounds shown for it to the satisfaction of the court, it is a common law writ, and in the particular class of cases to which it is applicable by the principles and usages of the law, it is no less so than any other common law writ known to our practice, and the jurisdiction of it and the authority to issue it in such cases was acquired by this court in the same manner as it acquired jurisdiction and authority to issue any other common law writ in a case to which it was by the principles and rules of the common law properly applicable. And if by the laws of this State the case before us be one to which the remedy by writ of mandamus is properly applicable, and the parties to it and the specific subject matter of the suit are within the jurisdiction of the court, can the fact that the property in question, the books and papers to be inspected, belongs to a foreign corporation, or a corporation created by another State, and are in the keeping of an officer or agent of it residing in this State, be any defence in law to it? The same law which confers upon the relator the right to the inspection demanded imposes on the respondent, the agent of the corporation, and on the corporation itself, so far as it is concerned, the liability to it, and neither is conferred or imposed by the terms of its charter, but by the general law of the State where it was created, as well as here under the facts and circumstances admitted in the case.

The other case alluded to was *The State of Nevada ex. rel. Samuel T. Curtis v. H. V. S. McCullough*, 3 Nevada, 202. It arose on an application for a writ of mandamus to compel the defendant, McCullough, to deliver to the relator, Curtis, all the books and papers belonging to the office of Superintendent of The Overman Silver Mining Company, and to admit him to the enjoyment of all the rights incident to the position. The company was an organized corporation under the laws of the State of California, for the purpose of carrying on the mining business in Nevada where the mine of the company was situated. McCullough was elected superintendent of it by the Board of Trustees to hold the office, according to the by-laws, during the pleasure of the board, and en-

tered upon the duties of it, but was afterwards removed from it by the board, and another man by the name of Lambert was substituted, who was also removed, and Curtis, the relator, was appointed. Lambert disclaimed any right, but McCullough refused on demand made to deliver the books and papers of it to the relator, or to transfer the control of the line to him, or to allow him to discharge the duties of the office. The jurisdiction of the court was questioned and denied on the ground that the company was a foreign corporation organized and existing, in the State of California, subject to its laws, and because the appointment of both the relator and the defendant were made in California, and the question of the right of either of them to exercise the powers of superintendent of the company, was cognizable in the courts of California, and because the officers of a foreign corporation cannot be recognized as officers beyond the limits of the sovereignty which creates the corporation. But the court in that case held that it had jurisdiction and the power to issue the writ of mandamus as prayed for in it.

The existence of The Diamond Match Company, as incorporated under the laws of the State of Connecticut to carry on the business in which it is engaged in that and other states of the Union, and for that purpose to erect factories and appoint agents and employ servants in other states, has been expressly recognized by statute in this State, and even without that, its lawful right and authority to do so, if not forbidden by the laws or policy of the State, could not be called in question under the principle of interstate comity in relation to such corporations existing in the several states now so well recognized and established to its fullest extent in this and the other states of the Union. *Bank of Augusta v. Earle,* 10 Pet., 519.

And therefore, notwithstanding the peculiar and unusual character of it, I have not been able to discover, either upon principle or authority, any well founded objection to the jurisdiction of the court, or the redress sought by the relator in this case; and I will further say that as under the liberal and enlightened comity of the states with respect to the incorporations severally created by them, almost all of the rights and facilities for trade and commerce, buying and selling and making contracts in the line of their legitimate business, and of suing on them in the courts of this and other

States, are now as freely enjoyed by the incorporations of other States as by natural persons or partnerships residing in those States, and likewise engaged in a business extending into other States, and with such equality of commercial rights and privileges extended to them, there can be no good or sound reason why the books and papers, and the agent of the company having them in his custody, should in this case be exempted from the jurisdiction of this court and their legal liability to the relator, simply because the company was chartered in another state and is a foreign corporation.

The tendency of decisions in our own courts has long been to consider such corporations when plaintiffs in suits before them, very much the same as they would a natural person from the same State in a like case and position before them, but when the position is reversed, and the interest of such a corporation is on the side of the defendant in the suit, as in this case, even the comity and favor thus extended in the former case forbids that its charter should be used as a shield of defence and a bar to the jurisdiction of the court in it.

COMEGYS, C. J., concurring:—While it might be useful, under circumstances, to inquire particularly into the origin of the writ of *mandamus* and the redress it afforded in the course of the administration of English Jurisprudence, it is sufficient to say, that it has long since ceased to retain its original quality, and has come to be regarded as an appropriate remedy for the enforcement of private rights, *where there is no other adequate remedy.* In that respect, it bears a resemblance to the writ of injunction in Chancery—as to which it is the rule, that if there be adequate remedy at law, it is not to be issued. Similarly, if the party applying for *mandamus* have adequate legal remedy for his wrongs, it will not be granted to him.

In 24 How., 66, Chief Justice Taney, in speaking of the ancient character of the writ, says—" It is equally well settled, that a *mandamus* in modern practice is nothing more than an action at law between the parties, and is not now regarded as a prerogative writ. It undoubtedly came into use by virtue of the prerogative power of the English Crown, and was subject to regulations and rules which have long since been disused. But the right to the

writ, and the power to issue it, have ceased to depend upon any prerogative power, and it is now regarded as an ordinary process in cases to which it is applicable." This is the prevailing opinion in the courts of this country, and is that upon which this court has acted in cases requiring its announcement, which have come before it. It is a striking feature of the judicial mind in America, that it is capable of adapting the process of the courts to the furtherance of justice, in cases which require it, where such adaptation is congruous to the nature of the relief desired; as, at a period of great liberality of the legal understanding of England, the action on the case was expanded, beyond the narrow limits which then confined it, and made to be the remedy for the enforcement of all rights for which there was no writ supplied before. *In consimili casu* were the magical words which expressed the idea of appropriate decision. Adherent, however, from their hereditary and necessary conservatism, as the English are, to what may be called fundamental ideas with respect to all the attributes of government; and cherishing them as part of the constitution of the country, especially where (in any respect), the royal prerogative is concerned, the courts there still adhered to the notion, logical however, that the public must in some way be interested in the use of the writ before the Crown could, in contemplation of law, permit of its exercise. Of course, the ingenuity, not to say sophistry, of acute legal minds, could generally discover some cause, affecting the loyal subjects of the realm, which required the putting forth of prerogative power; and thus in many cases, of application for mandamus, the English Courts were compelled to yield to some extent to the doctrines so thoroughly pervading the courts in America, of the writ being as well for private as public benefit. This is the view of the writ taken by *Lord Mansfield in Rex. v. Barker,* Burr, 1267, and quoted by *Blackstone,* 3 Com., 110, "A *mandamus,*" says the great judge, "is a prerogative writ to the aid of which the subject is entitled, upon a proper case previously shown to the satisfaction of the court. The original nature of the writ, and the end for which it was framed, direct upon what occasion it should be used. It was introduced to prevent disorder from a failure of justice, and defect of police. Therefore it ought to be used upon all occasions where the law has established no specific remedy, and

where in good justice and good government there ought to be one. Within the last century it has been liberally interposed, for the benefit of the subject and advancement of justice. The value of the matter, or the degree of its importance to the public, is not scrupulously weighed. If there be a right, and no other specific remedy, this should not be denied." Afterwards, at page 2186, in *Rex. v. Askew*, he repeated the same idea thus—" There is no doubt that where a party who has a right and has no other specific legal remedy, the court will assist him by issuing the prerogative writ  *   * " But," he afterwards says, " the court ought to be satisfied that they have ground to grant a mandamus; it is not a writ that is to issue of course, or to be granted merely for asking." This language conveys, with a force and clearness of expression, more characteristic of Lord Mansfield than of any judge before or since his time, as it seems to my mind, the true idea of the quality of this extraordinary legal remedy—a means by which justice can be done, where there is no other adequate means of relief. The impress upon the English mind, made by this strong, precise language, was productive in 1854 of the Common Law Procedure Act, by which, it is said by High, " The law of mandamus and the practice and procedure in administering the relief were entirely revolutionized;" p. 28. In speaking, upon the same page, further about the act, he says, that " the effect of this sweeping enactment has been to place mandamus proceedings upon much the same footing as ordinary personal actions, &c." It was the notion of *prerogative* that prevented the comprehensive language and idea of Lord Mansfield from having their proper weight upon the English mind at the time of their delivery; and therefore, needing an act of Parliament to establish the right to the writ for private ends; but with us, where, in the nature of things, there can be no substance in the thought of prerogative, the mind of American Judges, pervaded by the spirit of a governmental system which treats the citizen as a unit of the aggregate sovereignty, and the different departments of the government and those who administer them, as so many means for the promotion of the general welfare of such aggregate, the writ has been treated (while we acknowledge its origin and original use) as a convenient and also necessary instrument to aid

the citizen in the enforcement of his private right, where, without it, he would be denied adequate redress for his grievances. I may conclude and say, therefore, that, in this State, the writ of mandamus is, although not a *writ of right* (that is, a writ to be issued at the pleasure of the citizen, but the right to use it must first be obtained from the proper court) yet that, being a writ for the enforcement of, or aid in prosecuting, a right where, without it, the party would have no remedy, it partakes so far of the quality of a writ, to be issued *ex debito justitiae,* that no court would be warranted in denying it, where a proper case for its exercise was presented. Though the order for its issuance is discretionary with the courts, as in other cases of so-called prerogative writs, yet the discretion is not an arbitrary one; but using the clear decisive language of this court as pronounced by Judge Black, in the case of *Godwin v. Collins,* 1 Harr., 216, in treating of the discretion of the court in the matter of authorizing amendments of pleadings, " the granting or refusing to grant the application rests in the sound discretion of the court—a discretion to be regulated by the circumstances of the case, and the principles of law settled in relation to like points." Taking that to be the meaning of what should be understood by the term *discretionary* when applied to grant or refusal of the writ of *mandamus,* it is my opinion that if the circumstances of this case show ground for the issuing of the writ, the law requires that it shall be placed within the control of the relator—the doctrine prevailing in this country being in full accord with that above quoted as having been announced by Lord Mansfield.

What are the circumstances of this case, as presented in the petition and answer?

A corporation exists, by a statute of Connecticut, to make and vend explosive matches. In the pursuit of its business, it had occasion to purchase real estate in Delaware in order to enable it to follow it here, with greater facility than it was then doing; accordingly application to the Legislature was made by it for a law; and, what was supposed to be the necessary authority was given by a private act recorded in this county, which is set forth in the pleadings. Acting under this enactment, this company has become the owner of real estate in Delaware, and also carries on a large

business here—not under any provision of positive law, but in virtue of what is a general understanding within this Union—that —corporations created by one of its members shall, so far as certain rights are concerned—for example the carrying on a trading business (as that of this company is) the making and enforcing contracts with reference thereto, &c., be considered and treated as domestic creations, and put upon like footing with them. This is not a matter of right, constitutional or legal; but is consent—that sentiment among the States of our Union, bound together by common friendship and common interest (stronger than any law) which we call comity. It is this which gives to a mere artificial creature, as a corporation is, the privilege, *ex gratia* but not *de jure*, of acquiring a sort of domicile in a state not of its birth, and prosecuting its businesss like a citizen. I am speaking now of States generally. There may be provisions in the constitutions or laws of some of them, which would render the exercise of a corporate right illegal without the requisite legislative authority. But we are not now concerned with a question of that kind. The Diamond Match Company, transacting its business here, supposing that business to be confined to the manufacture and sale of illuminating matches, stands upon the same footing as does any foreign corparation for any manufacture that might be carried on without the necessity of a corporate right which individuals could not, *qua* such, exercise. We have, then, a foreign trading corporation doing business in this State, and having the right ( we permitting it to operate here) to ask of us protection in the orderly pursuit of its business, and the use of the process of the law which our citizens employ to enforce their contracts. Having opened the doors of the State (which we had the right to close against it) to this company to enter in at and carry on its trade, we are bound not only by the law of hospitality, but the higher one of justice, to treat it as any creature of our own pursuing like business. States must act " *uberrima fide.*" Where such condition of things exists—concession of the right to trade and to call upon the State, through its courts to enforce its trading contracts, there must, in the nature of things, coexist the correlative obligation on the part of the foreign corporation, to treat itself as subject to the same duties that might be required of one made by domestic law. It seems to me there might

be, in many cases, a great defect of remedy, or failure of justice, if this were not so. I think it ought to be so in the interests of justice—for the promotion of which rightful government can alone exist—and I have no hestation in saying that it is the view of law which should govern this court in all cases appropriate to its application.

It appears that, in addition to the fact, that the Diamond Match Company carries on business here, and possesses real estate for that purpose, the President of its Board of Directors, William H. Swift, the defendant in this proceeding, resides here as a citizen. It also appears that certain books and papers of the company are in this State in his custody and control to some extent as President. It further appears, that the relator is a large stockholder in the corporation, and in the course of his business pledged his certificates of shares and the stock they represented with certain parties in Michigan, (Messrs. Buhl and Alger), as security for certain money advanced by them to him, with the understanding that they should be entitled, if the debt were not duly paid, to apply the dividends of the net earnings of the company applicable to those shares, to the payment of the advances.

It seems that, during a certain period mentioned in the papers, no dividends were declared by the company. The relator has commenced a suit against his pledges in the courts of Michigan to procure a surrender to him of the certificates aforesaid, upon the ground that, in fact, the pledges have received from the company dividends or division of profits, upon the shares they represent, or otherwise, on account of their having them, to an amount exceeding the money advanced by them and interest upon it. He alleges that the books and papers of the company, now in the possession of its President, the defendant here, will show that fact. He further states, that he cannot support his suit without such proof, and that he needs a copy of such portion of those books and papers as will furnish it; that he has applied to such President to allow him to inspect such books and papers and take copies of such portions of them as he needs in his suit; that inspection was granted him, but the privilege of taking copies was denied unless the directors of the company consented—the President promising to consult them. Afterwards, upon request and demand of the right

to make copies, refusal was made, and the ground thereof stated to be that the directors forbade it. This application stands upon these facts, about which there is no dispute.

The objection made to the grant of the application rests upon two grounds. In so stating, I treat all that was said about the nature of the writ, as affecting the action of this court, as being not only unavailable, but as being more historical and explanatory than argumentative. It was certainly, however, admirably expressed every way. Those grounds are, *first*, that this court is without jurisdiction in this case; *second*, that if it have it, a proper case for the exercise of it has not been presented.

These are formidable objections, it must be said; and, in either case, if sustained, are conclusive against the relief prayed for. Let us examine them.

In order to support the claim of jurisdiction, it would be improper to consider this as a contest between the relator and the Diamond Match Company—that corporation as a corporate body not having, from anything that appears, become in any way a party to the controversy between the relator and the defendant, William H. Swift. It is sufficient, as I conceive, for the assertion of jurisdictional power in this court, that the latter resides here, is a citizen of this State, and has in his possession as the chief officer of that corporation, and under his present control, the books and papers, copies of portions of which the relator wants to make, for use in his controversy in Michigan. This evidence he claims is essential to the support of his suit, which cannot go on without it. As the books and papers of a corporate body are the best evidence of its operations and condition, and as that condition within the period stated in the petition and affidavit, is the vital fact upon which the relator's case depends, and there is no law by which the company can be made to produce them in the action in Michigan, it is of the first importance to the relator that he shall have the next best evidence of their contents—examined copies. He can now only get them by an order of this court in the shape of a writ of *mandamus;* for the defendant will not allow copies to be made, and his refusal is the result, as it appears, of the Board of Directors of the company to permit him to give his consent. Whatever the President might be willing to do, his board will not permit the

relator to have access to the books, to obtain the evidence he must have, to prosecute his suit with success.

It is perfectly true, as stated in the argument, that, in contemplation of law, a corporation has its residence, or domicile, using such terms as apply to individual persons, in the State or country of its creation and nowhere else; it being an invisible, intangible creation, existing only by positive law operating only intraterritorially, it necessarilly resulted that it had efficiency in the form of its creation and not out of it. This was the original idea of corporations, and hence the proposition asserted so constantly by text-writers and by courts, that they can have no legal existence out of their own jurisdiction. If we are to understand by this that, *propria rigore*, a corporation can do nothing out of the territory of the creating power, then there can be no ground for dispute about it; but when we come to look at what I have before set forth with respect to what we call inter-state comity, it will appear that such proposition must be received with the qualification which such a state of things requires. Looking at the states as integral parts of a homogeneous whole, with governmental interests of a purely common nature, it came to pass, as of course, and for the convenience of each and all, that corporate bodies for trading purposes should, with respect to the end of their creation, be allowed to act and transact everywhere, the same as those of native creations. While, therefore, it is technically true that they have no legal existence out of their jurisdiction; yet, in point of fact, all the States recognize them as, at any rate, entitled to carry on their trades in them, and to sue in their courts for the collection of money due upon contracts with them, and to recover damages for injuries to their property. It is a requirement of the state of absolute free trade between the States, that this should be so. This, of course, is matter of convenience; but it is more, it is in furtherance of the interest of the State, into which another State corporation sends its agents to reside and conduct its business, that it shall not only be permitted to dwell in peace therein, but to transact its necessary affairs without let. This privilege is no right, but is so near akin to it, as to carry with it the usual incidents of a right. And it is so extensive, that what are in fact corporate rights—the right to sue and to purchase and hold property by whatever title are conceded

to it, besides others. While the foreign corporation may not do all the acts authorized by its incorporation, in another State, yet it does many of them, and they, as I have shown, are corporate acts, and not those of mere administration. We must, therefore, not be misled by the unqualified assertion that corporate bodies have no legal existence outside of their creative States. They do exist, qualifiedly, for the promotion of the purposes of their creation; and, while in the non-creating State for those purposes, are subject to the laws of the resident State and liable to contribute, as domestic corporations are, to the public burdens. While this is not such allegiance as a citizen is charged with, yet is all that anywhere a corporation can be said to bear to a political society, except, perhaps, that resulting from the visitatorial power held by a creating State over its corporations. I say, perhaps; for whenever a foreign corporation, for certain purposes, shall abuse its powers in the State whose hospitality it enjoys, to the detriment of the citizens of that State, there would not be wanting reasons why its functions should be examined in the interest of the public welfare. It is not to be thought of, that the favor of the State shall be abused, without check or hindrance. How can it be fairly argued then, that this State has no jurisdiction over this corporation, and that it owes to her no allegiance? Suppose a corporate body should undertake to do any corporate act in the State—by which I mean an act which cannot be done by an artificial body without grant, express or implied; would not the restraining power of the law be put in exercise, or might it not be used, to prevent it? To find out whether under the plea of exercising mere trading powers, others of an unequivocal corporate nature were being used, would it not be competent to put the machinery of the law of a State in operation for the purpose? Undoubtedly. There is a well known preventive remedy, which would be called into action, and put in force, if a proper case should be presented. If then, the foreign corporation, or its agents, or servants, can be reached, for some purposes, like corporations of a domestic nature, or the servants of them, why not for others also, where the demands of justice require their amenability to the law? For my part, I cannot see; and I think that, in this case, we should make a great mistake if we gave our countenance to the refusal of the officers of this corporation

to allow the petitioner to make extracts from their books. What is the corporation of the Diamond Match Company? It is but a collection of individuals allowed to transact a certain business under a corporate name; and, through it, exercise rights it would be too inconvenient for them to use individually. Who are the President and Board of Directors of this body? They are stockholders in it, and its official servants. Who is the relator? He is a stockholder also, and a very large one· What are those books and papers in the possession of the president of the company, in this State, where business of the company is carried on? They are the record of its proceedings as a corporate body. Now it is, beyond any question, true, that any stockholder, large or small, has the right to examine those books and papers and take copies of them, whenever his interests require it, and the transaction of the business of the company, by its officers, would not be disturbed by so doing, and the time when it is sought to examine them, is not an unsuitable one. Who can gainsay his right? Can anybody? If so, by what authority? No one can; unless some power to prevent it is contained in the charter, or the corporators have made terms, with respect to examination, which would be violated if the privilege were exercised by him at the time of his demand. And this right cannot be allowed to depend, for its enjoyment, upon the accident or design of wrongful custody of them at the time. In a proper way, and for proper purposes—the enforcement or defence of his rights and interests, &c.,—they must be opened for his use. They are his, as much as they are the property of any other stockholder; and none can defeat his right.

Here then we have the books of the relator's corporation in this State, and in the custody of its chief officer, with what must be held to be the consent of the directors of the company who are its legal agents; that corporation is, for the purposes of its business, the owner of valuable real estate here, in virtue of purchase under an act of Assembly the passage of which was sought by it; it carries on an extensive and valuable business, involving powers certainly of a corporate character and with the immunity in its members of being free from responsibility, or any personal liability, for its debts or contracts; what in the name of reason is its *status*

if not that of residence, or domicile of some sort? And if any, what plea ought to weigh with this court against the petition of the relator? In my judgment The Diamond Match Company, by doing business here, is here, for all purposes of jurisdiction, in actions against it, as well as for it. Any other conclusion would recognize this strange state of things, that a corporation would enjoy immunities in a state which no individual could have. An individual in a State, for a mere temporary purpose, is under the protection of the laws and has upon him the correlative duty of obedience and submission to them. Should not a foreign corporation, transacting a large business in a State and having there the residence of its chief officer, be under like duty of obedience and submission? Certainly. Would a court hesitate to make an order, as prayed for here, if an individual within the State were a proper subject for its exercise, the proper case being made out? Surely not. Then why, I ask, in the case of a foreign corporation, acting and doing here under the sanction and protection of our laws? Is it higher than a body of our own creation? But it is urged that the foreign corporation is resident elsewhere and you cannot reach it with your process. Admitting for the sake of the argument only that to be true, yet the books belonging to it and wanted to be used, for copies, in the suit in Michigan are here by its consent in the charge of its President, and all the relief asked for can be obtained by an order on him, the custodian of them by the consent of the corporation, but for the use on proper occasions of a stockholder who is in his corporate relation a part owner of them with the other stockholders.

Impressed as I was with the very able manner in which the opponents of this petition presented their case, and recognizing the great strength of their arguments, viewing the question to be decided from their standpoint, I cannot but feel that they were met and more than met by those presented on the side of the petitioner, which are better adapted to the consideration of the case before the court, viewed in the light of the law which now prevails all over this land with respect to corporate bodies of a private nature, and those doing business by acquiescence, in a jurisdiction in a technical sense alien to that of their creation.

Having now treated the subject as fully as the exigencies of

the occasion allow, and with a sincere wish to further the ends of justice if by law in this case it may be done, I am of opinion that the prayer of the petitioner should be granted.

WOOTTEN, J., dissenting:—A company was incorporated in the State of Connecticut, under the name of " The Diamond Match Company " and to enable them to carry on their business in this State under a corporate name, application was made to the Legislature for a law authorizing them to do so and a private act was passed, which is set out in the pleadings. What authority that act confers upon them is not a matter necessary for this court to determine for the purposes of this case. It is sufficient to know that this company having its existence under and by virtue of the laws of the State of Connecticut, does carry on the business of manufacturing matches in this State, and the President resides here, and has a portion of the books and papers belonging to the company in his possession and custody. And it further appears that the relator is a large share or stockholder in the company, and for the purpose of enabling him to raise a sum of money which he desired to have at the time, pledged his certificates of stock to Messrs. Buhl and Alger as collateral security, who advanced to and loaned him a certain amount of money mentioned in the relator's petition and other proceedings, under an agreement, that if the money so loaned and advanced was not at the time designated for payment, duly and promptly paid, that the net earnings of the company so far as the same were applicable to the shares or stock so pledged should be applied to the payment of the money so loaned and advanced to the relator, David M. Richardson, by the said Buhl and Alger, it appears by the evidence before us that for a period of time set forth by the relator's petition and other papers, no dividends were declared by the Company.

The relator, David M. Richardson, has instituted suit against the holders of his stock in the Court of Chancery of Michigan, for the purpose of obtaining a surrender of his certificates of stock on the alleged ground that the holders of it, for the purpose, hereinbefore mentioned, have received from the company, dividends or profits from the stock so held by them, to an amount exceeding the sum advanced and loaned by them to the relator,

with interest thereon. The relator alleges that the books and papers, now in the possession of the defendant, Wm. H. Swift, are material and necessary evidence for him, because they show these facts, upon which this case mainly depends, and that without such evidence, he cannot maintain his said suit in Michigan, and that he is remediless without copies of such portion of such books and papers as are essential to the establishment of his claim. The relator alleges, and it is admitted in the defendant's answer, that he has applied for the privilege of inspecting the books and papers in the possession of the defendant, and that he was allowed to inspect and examine all the books and papers in defendant's possession; but denied the privilege of taking copies thereof; the directors of the company residing in the State of Connecticut, the State which created this corporation, and where it only exists, having directed him to refuse copies.

On this statement of facts, the relator bases his application for a writ of mandamus to compel the defendant, Wm. H. Swift, to allow the relator not only to inspect the books and papers of the company, which is a right conceded to him and heretofore allowed him, but to take copies of all, or such portions thereof as he may think proper to have and use for any and all purposes whereby they would be made public. The application is resisted on two grounds, first, the want of jurisdiction in this court to grant or award the writ, and secondly, on the ground that if the court has jurisdiction a proper case has not been presented for the exercise of it.

The writ is asked for in this case to compel Wm. H. Swift, President of The Diamond Match Company, a foreign corporation, to allow the relator to take or have copies made of the contracts, books and papers of the company to be used in the courts of another State, not even that which created the corporation, and in a suit to which The Diamond Match Company is not a party, and in nowise interested in the litigation; but between a stockholder and persons from whom he borrowed money on the pledge of his stock.

All proceedings instituted for a writ of mandamus are in the name of the State of Delaware, and why is it so? Because in cases where this extraordinary remedy is resorted to or sought, the State or people have relation to or are interested in the subject matter

over which the court is called upon to exercise a supervisory power. Now what sort of interest has the State of Delaware, or the people in the suit pending in Michigan between the relator and those to whom he pledged his stock for borrowed money? I confess I am at a loss to conceive of any whatever, and why then should the State be a party? If it is not properly a party, and the proceedings are not legitimately in its name, it is evident that this court has no jurisdicdiction or supervisory control over the subject matter, and therefore cannot award a writ of mandamus.

In England, the writ is called an *extraordinary remedy*, pertaining to the sovereignty of the State or people, and was introduced to prevent disorder by reason of a failure of justice, and a defect of the police force. High on Ext. Remedies; Tapping on Mandamus, 76 Law. Lib. 58; 2 Potter on Corporations, Sec. 635.

The writ is a proper remedy and will be granted to compel inferior courts to exercise their jurisdiction, but not to dictate their action, or to control them in the exercise of their discretion. It is the proper remedy, and it is made available by our courts to compel *public officers* to perform specific duties imposed upon them by law. It is also the proper remedy to compel corporations to perform duties or functions which are of a corporate character, and made obligatory on them by the act of incorporation or other law.

But can it be supposed for a moment that these inferior courts, public officers and corporators can be of foreign States, and brought under the superior control of the *extraordinary remedy*, the writ of mandamus or is it not manifest that they must be of the State in which, and by whose court the mandamus issues? How can this court, enforce by mandamus, duties imposed by the law of Connecticut on its corporations, any more than it can enforce the performance of the duties of its public officers, or compel the exercise of the jurisdiction and discretion of the inferior courts of that State?

It is true that our courts have become more liberal in the exercise of their discretion in granting writs of mandamus in cases of corporations; but the ground and object of the jurisdiction are still the same, that is, that the State having an interest in corporate bodies created by it and protected by its laws the people have a right to see that all such bodies or corporations, conform to the

purposes of their creation. The proceedings, as I have before said, are always in the name of the State, and they are so because the people are interested to the extent of seeing that corporations fulfill strictly the purposes intended by their creation.

All the elementary books are in unison as to the authority from whence the jurisdiction eminates, that is from the sovereign power in the name of the State or people directed to some subordinate tribunal, corporate body, or public officer.

All within the jurisdiction of the court from and by which it is issued requiring and commanding the performance of some specific legal duty, or the surrender of some clear legal right. I think very nearly if not all the cases cited in support of the relator's side of the case, are within the principle which I have just enunciated, and I am not aware of any case to which our attention has been called, on the authority of which this court could award the writ of mandamus on the facts before us in this case.

A great many cases have been cited and we have been referred to a variety of cases, decided in other States; but not one like the relator's that we are now considering—that the writ will be issued to compel inferior courts to exercise their jurisdiction and discretion, to compel public officers to perform their duties and functions, and to require corporate bodies to comply with the law of their creation, no one doubts; but it is equally true and undoubted that there must not only be jurisdiction in the court awarding the writ, but the right to it must *be clear and undoubted*; all the books concede this to be the law applicable to the remedy by mandamus.

We are not without some light to guide us in the decision of this case, eminating from the decisions of our own courts. In the case of the *Union Church v. Sanders*, decided by the Court of Errors and Appeals, Chancellor Johns in delivering the opinion of court, said: " The first and most important question is that of " jurisdiction. For the purpose of ascertaining correctly whether " the Superior Court had authority to award the writ of peremp- " tory *mandamus*, it is necessary to examine and understand the " character of the injury complained of by the petitioner, and the " remedy which he has sought to obtain. If no legal right has " been violated there can be no application of a legal remedy. The

" writ of mandamus is a legal remedy for a legal right." *Union Church v. Sanders*, 1 Houston, 125.

And in the case of *Cannon et al. v. Janvier et al.*, 3 Houston, 31, the court said: " The writ of mandamus is a prerogative writ, as it is termed in the law, by which the Court of King's Bench in England exercises its supreme jurisdiction over public bodies and officers in the administration of justice in cases in which the law has provided no adequate or specific remedy, to prevent a failure of justice, and has been peculiarly applied to the regulation of corporations for the purpose of compelling them to observe the ordinances of their constitution and to perform their specific duties, and to respect the rights of those who are entitled to participate in their privileges." *Wilk. on Mun. Corporations*, 14 Law Lib., 193.

These cases were both church cases, and all the parties residents of our own State. The case I am now considering is a very different one indeed, and I think without a precedent. The corporation was created in Connecticut, the relator resides in Michigan, the defendant, Wm. H. Swift, resides in Delaware, and the suit in which it is alleged the copies of the books, contracts and other papers of the Diamond Match Company are desired to be used is pending in the State of Michigan, between parties resident there.

What legal right has been denied or withheld from the relator by the Diamond Match Company, or by Wm. H. Swift, its President? What clear and undoubted legal right has he shown himself to be entitled to, of which he has been deprived? It is not that he has been denied the privilege of examining and inspecting the books and papers of the Company in the custody and possession of the defendant, for he admits he has been allowed to do that; but it is said for him that he was not allowed to take copies of them. True it is he was not permitted to take copies of the books and papers, and the defendant refuses to allow him to do so under an express order of the directors or managers of the company, under whose control and direction he is as one of the board and the President thereof. The directors or managers, with the single exception perhaps of himself, reside in Connecticut, certainly not in Delaware. Now is it not manifest that the corporate body should have been made a party to this proceeding? The relator is

a stockholder, and as such bound by the action of a majority of the directors or managers, who are but the agents or instruments of the stockholders. It has been held by the courts of this State that a majority of the stockholders of a Railroad Company could procure an amendment to their charter, and change the entire line of the road, and those of the stockholders who had not paid all of their subscription were legally bound to pay it, though they were opposed to the change of the line of the road and never assented to it. It was so held for the reason that they had become members of the corporation and were obliged to submit to the action of a majority of the stockholders. *1 Houston,* 149.

The relator is a stockholder in The Diamond Match Company, and had the right to vote for directors or managers, and perhaps did, but whether he did or not is perfectly immaterial for any purposes of this case. It is presumable that all incorporated companies make and adopt rules and by laws for their guidance in the management of their business. Whether this Diamond Match Company has a by-law stipulating the time when stockholders are permitted to examine the books and accounts, or whether it has one prohibiting stockholders from taking copies thereof, I am not informed; but if there be such by-laws, the relator is bound and concluded by them, and for that if for no other reason, would not be entitled to this extraordinary remedy, a writ of mandamus. *Tapping on Mandamus,* 83, 76 Law Dib., 132.

It has been very truly said that no charge has been made against the corporation of improper management, as being prejudical to the interests of the relator—no charge that the relator is or has been deprived of any *office, status* or *right* that legally belongs to him in the said corporation, nor that he is denied in any way participation in the control or management of its business. He does not seek to be permitted to perform his duties and to exercise his right as a *director,* nor to be permitted to have all the privileges of a corporator, nor to inspect the books, nor to compel the performance of a corporate duty, specially imposed on any particular officer of the company, by the laws of Connecticut, or by the ordinances or by-laws of the corporation. He admits the privilege of inspecting books and papers has been allowed him; but he asks that copies of the contracts, books and papers of the company be

given him, to be used in a litigation in another State, to which the corporation is a stranger, and in which the State of Delaware and its people are in nowise interested or concerned. And he asks that Wm. H. Swift, the President of the Company, be commanded by a writ of mandamus to be issued out of this court to furnish such copies, or to allow them to be taken. Here we come to the important question again, is this a *clear undoubted legal right?* Unless it is according to well settled principles of law applicable to such cases, the relator is without a remedy in this court, and the writ of mandamus should be refused and his application dismissed.

In view of all the facts of this case, as presented to us and the law applicable to it, I am of the opinion that this court has no jurisdiction, and if it had, the case presented for our consideration is not a proper one for the exercise of it, and therefore the relator's application for a writ of mandamus ought to be refused.