**In the Matter of the Appraisal of
ENSTAR CORPORATION.**

Supreme Court of Delaware.

Submitted Dec. 17, 1991.
Decided March 5, 1992.
Rehearing Denied March 24, 1992.

A. Gilchrist Sparks, III (argued), and David G. Thunhorst of Morris, Nichols, Arsht & Tunnell, Wilmington, for appellant.

Grover C. Brown (argued) of Morris, James Hitchens & Williams, Wilmington, Jay Cohen of Paul, Weiss, Rifkind, Wharton & Garrison, New York City, of counsel, for appellees.

Before HORSEY, MOORE and HOLLAND, JJ.

HOLLAND, Justice:

This is an appeal by the respondent-appellant, ENSTAR Corporation ("ENSTAR"), from a final judgment of the Court of Chancery. The Court of Chancery concluded that a settlement agreement between ENSTAR and the petitioners-appellees, Marc Belzberg, Abraham Farbstein, First City Financial Corp. Ltd., and First City Trust Company (collectively the "Belzbergs"), was specifically enforceable. *In re ENSTAR Corp.*, Del.Ch., 593 A.2d 543 (1991). The Belzbergs have filed a cross-appeal from that portion of the Court of Chancery's decision which denied their application for attorneys fees.

In this appeal, ENSTAR has raised four contentions. Its first contention is that the Court of Chancery erred by specifically enforcing an agreement, the material terms of which were never agreed upon by the parties. ENSTAR's second contention is that, even assuming that an enforceable agreement was created on January 17, 1986, the Court of Chancery erred in determining that the parties' mutual mistake of fact regarding the Belzbergs' receipt of the merger consideration was not material and, therefore, did not entitle ENSTAR to rescind the agreement. Third, ENSTAR contends that the Court of Chancery erred in determining that the Belzbergs' misrepresentations regarding their receipt of the merger consideration did not permit ENSTAR to void the settlement agreement. Finally, ENSTAR asserts that the Court of Chancery erred in finding that ENSTAR's attorney's mistaken belief that the Belzbergs had never exchanged their shares for merger consideration was not grounds for the rescission of the agreement.

In its cross-appeal, the Belzbergs assert that the Court of Chancery erred by failing to require ENSTAR to pay the Belzbergs' attorneys fees. The Belzbergs argue that this was a term of the January 17, 1986 settlement agreement. Alternatively, the Belzbergs argue that attorneys fees should have been awarded to them when they prevailed in enforcing the settlement agreement.

We have concluded that the settlement agreement "specifically enforced" by the Court of Chancery was not the agreement which had been reached by the parties on January 17, 1986. In fact, the record reflects that the material terms of the settlement agreement imposed upon the parties by the Court of Chancery were never even discussed by them. Therefore, the judgment of the Court of Chancery, purporting to "specifically enforce" the settlement agreement of January 17, 1986, is reversed.

The judgment of the Court of Chancery denying the Belzbergs' application for attorneys fees is moot.

### Facts

On September 4, 1984, ENSTAR mailed a proxy statement in connection with a special stockholders meeting to be held on September 25, 1984. The purpose of the special meeting was to have the stockholders consider and act upon the proposed merger of Unimar Subsidiary, Inc. with and into ENSTAR. Pursuant to the terms of the proposed merger, each ENSTAR share would be converted into the right to receive $2 in cash and one Indonesian Participating Unit ("IPU").[1]

When the proxy statement was mailed, the Belzbergs were the beneficial owners of 156,828 shares of ENSTAR stock. However, the Belzbergs were not the record owners of any shares of ENSTAR stock. The Belzbergs held their stock in several layers of nominee names. A majority of the Belzbergs' shares were held by Chemical Bank, which in turn held the shares through the Depository Trust Company and its nominee, Cede & Co. ("Cede").

After receiving notification of the merger, the Belzbergs apparently decided to exercise their statutory right to seek an appraisal of their shares rather than accept the merger consideration. At the request of the Belzbergs, Robi Blumenstein ("Blumenstein") of First City Capital mailed a "demand" letter to ENSTAR on Friday, September 21, 1984. The Belzbergs acknowledge that Blumenstein's letter stated, incorrectly, that First City Financial Corp., First City Trust Company, Marc Belzberg and Abraham Farbstein "are each registered stockholders of ENSTAR."

On Monday, September 24, Blumenstein received a telephone call from Pat Dyer, the General Counsel and Secretary of ENSTAR, informing Blumenstein that the September 21, 1984 demand letter was defective. Dyer informed Blumenstein that ENSTAR considered the demand defective because it failed to specify the number of shares for which appraisal was being sought and because the persons named in the demand letter were not stockholders of record. After speaking with Dyer, Blumenstein sent an amended demand letter to ENSTAR identifying Cede as the registered owner of 156,828 shares of ENSTAR stock owned beneficially by the Belzbergs. Blumenstein's amended demand letter of September 24, 1984 to ENSTAR did not explicitly state that he was making the demand on behalf of Cede.

On September 25, 1984, the proposed merger was approved at the special stockholders meeting and Unimar Subsidiary, Inc. was merged with and into ENSTAR.[2] The Belzbergs never notified their nominee that their shares should not be exchanged for the merger consideration. In October of 1984, the stock owned beneficially by the Belzbergs was submitted by their nominee, Cede, in exchange for the merger consideration. On October 17 and 18, 1984, the Belzbergs' nominee accounts were credited with 156,828 IPUs (with an approximate value at the time of $1.72 million) and $313,656 in cash. Thus, in October of 1984, the Belzbergs' nominee accounts reflected the Belzbergs' receipt of the merger consideration, having an aggregate value to them of approximately $2.03 million.

In late October or early November, 1984, Blumenstein learned that ENSTAR had paid the merger consideration to the Belzbergs' nominee accounts. Blumenstein

---

**1.** According to ENSTAR, an IPU is a security listed on the American Stock Exchange which entitles the holder to share in 32% of the cash flow generated by ENSTAR's interest in an Indonesian joint venture for a 15–year period commencing on September 24, 1984 and terminating on September 25, 1999. ENSTAR, has represented that the holder of an IPU receives a quarterly distribution based on a nondiscretionary mathematical computation relating to the operations of the joint venture during that quar-

ter. ENSTAR states that the values of IPUs fluctuate based on market conditions (particularly world oil prices) but over time decrease due to the fact that the right to distributions terminates in 1999. The Belzbergs do not dispute these representations by ENSTAR.

**2.** Consistent with demanding appraisal, Blumenstein arranged for the Belzbergs' ENSTAR shares to be voted against the proposed merger.

promptly contacted the Belzbergs' New York counsel, Richard Borisoff ("Borisoff") of Paul, Weiss, Rifkind, Wharton & Garrison. The purpose of Blumenstein's contact was to ascertain the legal implications of the receipt of the merger consideration on the Belzbergs' demand for appraisal. Borisoff consulted James Burnett ("Burnett") of Potter, Anderson & Corroon, the Belzbergs' Delaware counsel. The Belzbergs' Delaware counsel advised Borisoff that the surrender of the ENSTAR shares and the receipt of the merger consideration might give ENSTAR an additional defense in the appraisal action. After consulting with their attorneys, the Belzbergs took no action to reverse the transaction in which their ENSTAR shares had been exchanged by their nominees for the merger consideration.

Many of ENSTAR's stockholders had exercised their statutory rights and demanded an appraisal of their shares in lieu of receiving the merger consideration. After the commencement of the consolidated appraisal action, ENSTAR filed a motion in the Court of Chancery for an order requiring, *inter alia*, that all claimants in the appraisal action file their stock certificates with the court. On April 16, 1985, the Court of Chancery instead determined that ENSTAR should be required to file a stockholder information form with respect to each shareholder seeking appraisal. The Court also directed ENSTAR to set forth in the stockholder information forms all objections that ENSTAR intended to interpose with respect to each of the appraisal claimants.

On June 11, 1985, ENSTAR filed stockholder information forms with the Register in Chancery. With respect to the Belzbergs, ENSTAR asserted that the Belzbergs' demands for appraisal were defective in that they were not made by or on behalf of a stockholder of record. On July 24, 1985, the Belzbergs executed the stockholder information forms filed by ENSTAR. In response to the objection raised by ENSTAR, the Belzbergs asserted reasons why the failure of the demand to be executed by or on behalf of the record holder should be excused.

On January 11, 1986, Blumenstein received a telephone call from another appraisal claimant who informed him that a settlement of the appraisal action was about to be proposed by ENSTAR. On January 15, 1986, the attorneys for the principal parties to the appraisal proceeding met in Wilmington to attempt to negotiate a settlement of the appraisal action. ENSTAR was represented by their Delaware counsel, Charles F. Richards, Jr. ("Richards") of Richards, Layton & Finger. One of the other attorneys who was present during those settlement negotiations was Burnett, because Potter, Anderson & Corroon represented several claimants in the appraisal action, including the Belzbergs.

On Thursday, January 16, the attorneys reached an agreement on the terms of a settlement, subject to entering into a written agreement ("Group Settlement Agreement"). The proposed settlement provided that ENSTAR would pay $20 per share, plus interest and attorneys fees, for all shares which ENSTAR did not contest were entitled to appraisal. Claimants whose rights to seek appraisal were challenged by ENSTAR, such as the Belzbergs, would receive the settlement consideration if the Court of Chancery later determined that their shares were entitled to appraisal.

Borisoff was advised of the proposed settlement by Potter, Anderson & Corroon on January 16, 1986. That same day, the Belzbergs rejected the proposed settlement. The next day, January 17, Potter, Anderson & Corroon withdrew · as Delaware counsel for the Belzbergs because they represented other clients who supported the settlement. Borisoff then took over the settlement negotiations on behalf of the Belzbergs.

On Friday, January 17, 1986, after the withdrawal of Potter Anderson & Corroon, Borisoff telephoned Richards. Borisoff proposed compromising the Belzbergs' claims at the same settlement price that ENSTAR had offered to the other claimants, $20 per share for *all* of the stock for which the Belzbergs were seeking apprais-

al, but without the interest that was to be paid to the other qualifying claimants. After conferring with his client, Richards telephoned Borisoff back on January 17 and conveyed an alternate settlement proposal on behalf of ENSTAR.

ENSTAR's alternate proposal, made by Richards on a "take it or leave it" basis, was that the Belzbergs would receive the merger consideration for 50% of their shares, and the settlement consideration ($20 per share, plus interest) for the remaining 50% of their shares. After consulting Blumenstein, on behalf of the Belzbergs, Borisoff made a counteroffer to Richards: the Belzbergs would receive the merger consideration for 25% of their shares and the settlement consideration for 75% of their shares. Richards responded that ENSTAR's prior alternate offer had been made on a "take it or leave it" basis and rejected the Belzbergs' counteroffer.

After again conferring with Blumenstein on another telephone line, Borisoff advised Richards that the Belzbergs would accept ENSTAR's 50–50 offer if ENSTAR's offer included payment of the Belzbergs' attorneys fees. This was agreed to, on behalf of ENSTAR, by Richards. Richards then restated the terms of the agreement and requested that Borisoff send him the Belzbergs' ENSTAR stock certificates along with a confirming letter. Borisoff agreed to do so.

It is undisputed in the record that Richards was negotiating with Borisoff under the mistaken belief that the Belzbergs still possessed their ENSTAR stock certificates and had not received merger consideration of approximately $2.03 million. The record also reflects that Borisoff, although once aware that the Belzbergs had surrendered their ENSTAR shares and received the merger consideration, had apparently forgotten this fact during the negotiations with Richards. The record also reflects that Blumenstein was aware throughout the negotiations that the Belzbergs' ENSTAR shares had been exchanged for the merger consideration, but did not raise the issue with Borisoff on January 17, 1986, even when he authorized Borisoff to make

the counteroffer that provided for the Belzbergs to retain 25% of their shares. According to the Belzbergs, Blumenstein "assumed" ENSTAR would be given proper credit for the merger consideration they had already paid when the settlement was implemented. There is no dispute that on January 17, Borisoff and Richards did not discuss what would be done with the merger consideration previously received by the Belzbergs.

After reaching the verbal agreement with the Belzbergs, Richards met with the attorneys for the other settling parties and advised them of the terms. Richards also advised the attorneys for the other claimants that he had asked Borisoff to confirm the settlement in writing and to transmit the Belzbergs' stock certificates to him. It was agreed that the Group Settlement Agreement would not be effective as between the settling parties until and unless the stock certificates and confirming letter were delivered by the Belzbergs. Counsel for one of the claimants proposed that Richards draft an escrow agreement reflecting the requirement that the Group Settlement Agreement would not become effective until the Belzbergs' stock certificates were delivered ("Escrow Agreement"). After the Escrow Agreement was executed, Richards telecopied the Group Settlement Agreement to Borisoff pursuant to Borisoff's request, and also telecopied the Escrow Agreement to him.

On Monday, January 20, 1986, Richards telephoned Borisoff to ask why the Belzbergs' ENSTAR stock certificates and the confirmation letter had not arrived. Borisoff replied that he was working on the letter and would have to obtain the stock certificates from Cede, and would therefore need another day to deliver the stock certificates to Richards. Later, on January 20 or on January 21, Blumenstein reminded Borisoff that the Belzbergs' shares had been exchanged for the merger consideration in 1984. Blumenstein realized that the Belzbergs could not comply with the terms of the Group Settlement Agreement or the Escrow Agreement that had been forwarded to Borisoff by Richards. Blumenstein advised Borisoff to

"[t]ell [ENSTAR] we can't do that because we have got this merger consideration. Instead we should have a mechanic that says let's figure out what the money was, have a settle-up and do it that way."

On January 21, 1986, Richards again telephoned Borisoff asking for the letter and the Belzbergs' stock certificates. During this telephone conversation, Borisoff told Richards that the Belzbergs' shares had been surrendered to ENSTAR in 1984 for the merger consideration. Richards asked Borisoff for further information concerning the circumstances relating to the exchange of the Belzbergs' shares for the merger consideration. Richards also asked Borisoff to send the letter previously requested for Richards to review. On January 21, Borisoff telecopied the letter to Richards. The next day, Borisoff communicated the information requested by ENSTAR concerning the exchange of the Belzbergs' shares for the merger consideration in 1984.

On January 24, 1986, after reviewing the information provided by the Belzbergs and conferring with his client, Richards informed Borisoff that ENSTAR was not willing to enter into a settlement with the Belzbergs and that ENSTAR considered any agreement "rescinded by its terms." That same day ENSTAR and the remaining principal appraisal claimants formally declared null and void the Group Settlement Agreement and entered into a new settlement agreement, which was ultimately approved by the Court of Chancery. The new settlement agreement differed from the original Group Settlement Agreement in that it no longer depended on the Belzbergs' participation before it could become effective.

On January 27, 1986, ENSTAR moved to amend the Belzbergs' stockholder information forms previously filed with the Court of Chancery to add as an objection to the Belzbergs' appraisal claim the fact that the Belzbergs had tendered their shares and accepted the merger consideration. The Court of Chancery granted ENSTAR's motion. *In re ENSTAR Corp.*, Del.Ch., 513 A.2d 206 (1986). However, it reserved deci-

sion on the existence and enforceability of the January 17, 1986 agreement between Richards and Borisoff. *Id.*

On September 9, 1988, the Belzbergs moved for summary judgment to specifically enforce the January 17, 1986 agreement with ENSTAR. In an unreported pretrial ruling upon the Belzbergs' motion for summary judgment, the Court of Chancery concluded that the January 17, 1986 negotiations between the Belzbergs and ENSTAR, in the absence of unclean hands, fraud, or mistake, had resulted in an enforceable settlement agreement. However, the Court of Chancery also concluded that material issues of fact existed as to ENSTAR's claims of unclean hands, fraud or mistake which, if proven, could invalidate the settlement agreement. Consequently, the Court of Chancery denied the Belzbergs' motion for summary judgment and set the matter for trial.

On May 8–10, 1990, a trial was held in the Court of Chancery on the factual issues remaining after denial of the Belzbergs' summary judgment motion. On March 18, 1991, the Court of Chancery entered its post-trial decision holding that the Belzbergs were entitled to specific enforcement of the settlement agreement. *In re ENSTAR Corp.*, Del.Ch., 593 A.2d 543 (1991).

The Court of Chancery entered an order implementing its post-trial decision on September 5, 1991, entitled "Order and Final Judgment for Specific Performance" ("Final Order"). That order, *inter alia*, directed ENSTAR to pay $1,439,041.50, representing $20 per share for 78,414 shares (one-half of the Belzberg shares) with interest, *less* the $2 per share previously distributed to the Belzbergs for the 78,414 shares, *less* the total of all distributions on 78,414 IPUs and *less* interest on the foregoing distributions at 10% from the date of the receipt thereof. The Final Order also directed the Belzbergs to *give back* to ENSTAR 78,414 of the IPUs currently held by them. It assessed the costs of enforcing the settlement agreement against ENSTAR.

*Primary Contentions*

This dispute involves the parties' efforts to compromise and settle the Belzbergs' demand for a statutory appraisal of their ENSTAR stock holdings. According to the Belzbergs, negotiations between their attorney, Borisoff, and the attorney for ENSTAR, Richards, resulted in a valid and legally binding settlement. Therefore, the Belzbergs filed a motion to specifically enforce that agreement. The Belzbergs argue that the opinions and Final Order of the Court of Chancery properly granted that motion.

ENSTAR asserts that no agreement was reached. Alternatively, ENSTAR argues that it would be inequitable to enforce the agreement. Both of ENSTAR's arguments are premised upon the fact that when Borisoff and Richards were negotiating, they both assumed that the Belzbergs still possessed their ENSTAR shares. Consequently, Borisoff and Richards never discussed whether or how to account for the Belzbergs' receipt of the merger consideration and the subsequent dividends received by the Belzbergs. Finally, ENSTAR asserts that the agreement "specifically enforced" by the Court of Chancery was not the agreement of the parties.

*Court of Chancery Opinions
and Final Order*

The background facts of the January 17, 1986 negotiations, which for the most part are not disputed, were set out by the Court of Chancery in a post-trial opinion, prior to the entry of its Final Order, as follows:

> On Friday, January 17, 1986, Mr. Borisoff and Mr. Richards negotiated a settlement of the Belzbergs' appraisal claim over the telephone. Mr. Borisoff first proposed that the Belzbergs would receive $20 per share, with no interest, for all their shares. Mr. Richards counteroffered, on a "take-it-or-leave-it" basis, that the Belzbergs receive the original merger consideration of $2 and one IPU per share for 50% of their shares and $20 per share, plus interest, for the remaining 50% of their shares.

> After conferring with the Belzbergs, Mr. Borisoff counter-proposed that the Belzbergs receive the original merger consideration for 25% of their shares and the $20 settlement price for 75% of their ENSTAR shares. Mr. Richards re-emphasized that his 50–50 offer was made on a take-it-or-leave-it basis, which required acceptance that day. After again conferring with the Belzbergs, Mr. Borisoff again called Mr. Richards and told him that his clients would accept the 50–50 offer if the payment of the Belzbergs' counsel fees were included. Mr. Richards agreed. Mr. Richards then restated the terms of the agreement and requested that the Belzbergs' shares be delivered to his office in Wilmington by the following Monday, January 20, 1986.

*In re ENSTAR Corp.*, 593 A.2d at 547.

The Court of Chancery concluded, in its pretrial opinion, that the terms of the settlement were certain:

> The Belzbergs were to receive the same $20 per share, plus interest, settlement consideration that ENSTAR's other dissenting shareholders were to receive for 50% of their shares. For their remaining shares, they were to receive the original merger consideration which consisted of $2 and one Indonesian Participating Unit per share. Additionally, ENSTAR, through Mr. Richards, agreed to pay the Belzbergs' attorney fees.

The record reflects that the Court of Chancery made two other significant factual findings. The first finding, in its post-trial opinion, was that "[a]t no time during the course of these negotiations did anyone representing the Belzbergs disclose to ENSTAR, or its counsel, that the Belzbergs' shares had actually been sent to ENSTAR in October of 1984." *In re ENSTAR Corp.*, 593 A.2d at 547. Second, the Court of Chancery concluded, in its pretrial opinion, that when the agreement was reached between ENSTAR and the Belzbergs, "there was no mention that the original merger consideration including the subsequent IPU dividends had already been received by the Belzbergs...."

# 411

The Court of Chancery's post-trial opinion granted the Belzbergs' motion to specifically enforce the settlement agreement, notwithstanding its finding that the prior surrender of the Belzbergs' shares in exchange for the payment of the merger consideration had never been discussed by Richards and Borisoff. In its pretrial opinion, the Court of Chancery simply stated "[p]resumably those sums [the merger consideration] could have been returned to Enstar." It is noteworthy, however, that the post-trial opinion did not specify the *terms* pursuant to which the agreement would be enforced. *Id.* at 554. Negotiations between the parties, as to the terms to be included in an appropriate form of order, were unsuccessful and each party submitted its own proposal.

The Final Order entered by the Court of Chancery was entitled "Order and Final Judgment for Specific Performance." It purported to "specifically enforce" the parties' agreement but, in fact, setoff the Belzbergs' prior receipt of the merger consideration against the settlement consideration, even though that had not been discussed by the parties. The Final Order of the Court of Chancery, in part, provided:

> Respondent ENSTAR Corporation ("ENSTAR") shall pay to First City Financial Corp., Ltd., First City Trust Company, Marc Belzberg and Abraham Farbstein (hereafter the "Belzbergs") the sum of $1,439,041.50, calculated at $20 per share for 78,414 shares with interest thereon at 10% from September 24, 1984, (1) *less* $2 per share distributed in cash to the Belzbergs for 78,414 shares following the merger, (2) *less* the total of all distributions received by the Belzbergs since the time of the merger on 78,414 Indonesian Participating Units, and (3) *less* interest at 10% per annum on each of the foregoing distributions from the day of receipt of each such distribution by

plaintiffs, with the foregoing computations of interest running through May 1, 1991.

> ENSTAR shall pay the sum specified in paragraph 1 to the Belzbergs on the later of (a) the 31st day from the date of this Order and Final Judgment and (b) *delivery by the Belzbergs* to ENSTAR of certificates duly endorsed to ENSTAR representing 78,414 Indonesian Participating Units (the "Units"); provided,[3] however, that such sum *shall be reduced* by the amount of any distributions made on the Units and interest on such distributions from May 1, 1991 until delivery of such certificates to ENSTAR. (emphasis added).

Thus, the record reflects that although the Court of Chancery opined that the parties had reached an agreement which was specifically enforceable, its ultimate disposition, as set forth in its Final Order, was a determination that it would be inequitable to specifically enforce that agreement according to its terms.

### Common Law Unilateral Mistake and Rescission

■ Generally, a party may rescind an agreement based on its unilateral mistake if the following conditions are met: (1) the enforcement of the agreement would be unconscionable; (2) the mistake relates to the substance of the consideration; (3) the mistake occurred regardless of the exercise of ordinary care; and (4) it is possible to place the other party in the status quo. 13 *Williston on Contracts* § 1573 (3d ed. 1970).

The Court of Chancery found that ENSTAR "was negotiating under the mistaken belief that the Belzbergs still possessed their shares." *In re ENSTAR Corp.*, 593 A.2d at 552. As a corollary, ENSTAR was unaware that the Belzbergs had received the merger consideration.[4] *Id.* Neverthe-

---

**3.** This portion of the Final Order was amended on September 5, 1991, as follows: "provided however that, without further action by the Court, such sum (the "Judgment Sum") shall be (a) increased by post-judgment interest at the legal rate from May 1, 1991 to the date of payment of the Judgment Sum, and (b) de-

creased by the amount of any distributions made on the Units after May 1, 1991, together with interest on each such distribution at the legal rate from the date of such distribution to the date of payment of the Judgment Sum."

**4.** The record reflects, and it is undisputed, that while negotiating the settlement agreement,

less, applying the foregoing unilateral mistake rule, the Court of Chancery opined that ENSTAR was not entitled to rescind the agreement because ENSTAR did not exercise ordinary care to ascertain whether the Belzbergs' shares had previously been exchanged for the merger consideration, and that it was not unconscionable to enforce the agreement because ENSTAR's unilateral mistake did not relate to the substance of the consideration. *Id.* The former conclusion was erroneous, as a matter of law, and the latter conclusion is not supported by the Final Order.

■■■ The Court of Chancery concluded that, notwithstanding ENSTAR's unilateral mistake, ENSTAR's lack of ordinary care in ascertaining that the Belzbergs' shares had been exchanged for the merger consideration precluded ENSTAR from rescinding the agreement. The Court of Chancery thereby placed a legal duty upon ENSTAR to discover the identity of the beneficial owners whose shares had been tendered in the merger. However, this Court has held that, in appraisal proceedings, the risks attendant upon holding one's shares through nominees are those of the stockholder and should not be shifted to, or borne by, the issuing corporation. *ENSTAR Corp. v. Senouf,* Del.Supr., 535 A.2d 1351, 1354–55 (1987). Therefore, ENSTAR did not have an affirmative duty to "reasonably" discover the identity of the beneficial owners of any shares which were tendered by a nominee in exchange for the merger consideration. Consequently, the Court of Chancery erred, as a matter of law, in imposing an obligation upon ENSTAR to have used "ordinary care" to ascertain that the shares owned beneficially by the Belzbergs had already been exchanged for the merger consideration by the shareholder of record, Cede.

The exchange of the Belzbergs' shares for the merger consideration was a single transaction. Nevertheless, the Court of Chancery examined the surrender of the Belzbergs' shares and the Belzbergs' receipt of the merger consideration as separable events. The Court of Chancery's treatment of the Belzbergs' stock exchange in 1984 was not only bifurcated but resulted in attributions of significance to each element of the transaction which were diametrically opposed. The Court of Chancery's opinion concluded that ENSTAR's "mistake as to the location of the share certificates did not relate to the substance of the consideration." *In re ENSTAR Corp.,* 593 A.2d at 552. Conversely, the Final Order of the Court of Chancery reflects that the "location" of the merger consideration did relate to the "substance of the consideration" to be paid to the Belzbergs pursuant to the settlement agreement.

■ The Court of Chancery succinctly summarized its view of the parties' January 17, 1986 agreement as follows:

The basic predicate of the settlement agreement was that the Belzbergs would relinquish all their legal claims against Enstar, without regard to whatever merit they may have had, and Enstar would pay to the Belzbergs an agreed sum.

*Id.* The Court of Chancery recognized that if ENSTAR was required to pay the Belzbergs the exact settlement consideration ("agreed sum"), the Belzbergs would be paid twice for their shares. The Court of Chancery stated that there is nothing "in the record to support a finding that the Belzbergs intended to receive a double payment (the merger consideration *plus* the settlement price)...." *Id.* at 550. In fact, the Court of Chancery found the payment of the merger consideration to the Belzbergs was so related to the "substance" of the settlement consideration that its Final Order required the merger consideration previously received by the Belzbergs to be deducted from the settle-

---

both Richards and Borisoff were under the belief that the Belzbergs still possessed their ENSTAR shares. The Belzbergs argue, however, that there was no mutual mistake because Borisoff had "forgotten" that the Belzbergs' shares had been surrendered for the merger considera-

tion. *In re ENSTAR Corp.,* 593 A.2d at 551. For purposes of this opinion, we will assume the "mistake" was Richards' (ENSTAR's) alone and not a mutual mistake. *See Home Life Ins. Co. of Am. v. McCarns,* Del.Ch., 16 A.2d 587, 589 (1940).

ment consideration and returned, in part, to ENSTAR.

Consequently, although it was denominated "Order and Final Judgment for Specific Performance," the Final Order of the Court of Chancery did *not* grant the Belzbergs' motion for specific performance. The Final Order of the Court of Chancery reflects a specific determination that it would have been inequitable to enforce the parties' agreement, according to its terms, because specific enforcement of the agreement would have resulted in the Belzbergs being paid for the value of their shares twice, i.e., the settlement consideration ("agreed sum") *in addition* to the merger consideration which they had already received.

▪ The Final Order of the Court of Chancery evidences a determination that it would have been "unconscionable" to specifically enforce the parties' agreement because it would have resulted in an unintended double payment to the Belzbergs. In view of that determination, the Court of Chancery should have ruled that ENSTAR was entitled to rescind the agreement. Instead, the Court of Chancery's Final Order reformed the parties' agreement by ordering ENSTAR to pay the Belzbergs the settlement consideration ("agreed sum") *minus* the merger consideration.

▪ The facts of this case fit squarely within the paradigm of the unilateral mistake rule and compel the equitable remedy of rescission. First, enforcement of the parties' agreement would be unconscionable because it would result in the Belzbergs being paid for their shares twice, a result which even the Belzbergs do not advocate. Second, ENSTAR's mistake was material and directly related to the substance of the settlement consideration, i.e., the "agreed sum," because ENSTAR did not know that the Belzbergs had previously received the merger consideration. *See Rosenblatt v. Getty Oil Co.*, Del.Supr., 493 A.2d 929

(1985). Third, ENSTAR's mistake occurred regardless of ordinary care. Since the Belzbergs were never shareholders of record, the prior tender of their shares by a nominee did not place ENSTAR on notice of anything regarding the Belzbergs' shares. In addition, Borisoff affirmatively represented to Richards that the Belzbergs still had their shares.[5] Fourth, it is possible to place the Belzbergs in the *status quo ante* because a rescission of the parties' agreement leaves the Belzbergs with the right to pursue their demand for a statutory appraisal of their shares, subject to ENSTAR's right to assert its defenses.

▪ ENSTAR's unilateral mistake should have resulted in rescission. *Hearne v. Marine Ins. Co.*, 87 U.S. (20 Wall) 488, 22 L.Ed. 395 (1866). A unilateral mistake cannot be a basis for reforming a contract. *Id. See Hob Tea Room, Inc. v. Miller*, Del.Supr., 89 A.2d 851, 857 (1952). The equitable remedy of reformation is only available to correct a mutual mistake in order to conform an agreement to the original intent of the parties. *Waggoner v. Laster*, Del.Supr., 581 A.2d 1127, 1135 (1990). Consequently, the record reflects that the Court of Chancery erred, as a matter of common law equity jurisprudence, in denying ENSTAR's application for rescission based upon ENSTAR's unilateral mistake. *Hearne v. Marine Ins. Co.*, 87 U.S. (20 Wall) 488, 22 L.Ed. 395 (1866); 13 *Williston on Contracts* § 1573 (3d ed. 1970).

### Statutory Settlement Approval Conditions Not Reformation

▪ A proper analysis of this matter cannot be conducted exclusively by an examination of the common law. An appraisal action is a creature of statute. *Alabama–By–Products Corp. v. Neal*, Del. Supr., 588 A.2d 255, 256 (1991). Therefore, with respect to the settlement of a statutory appraisal action there are additional

---

**5.** It is undisputed that during the negotiations on January 17, 1986, Borisoff affirmatively led Richards to believe that the Belzbergs still had the shares in their possession. Although Borisoff had forgotten that the Belzbergs had al-

ready tendered their shares, his misrepresentation, albeit innocent, reinforced Richards' assumption that the Belzbergs' shares had never been tendered for the merger consideration.

considerations. First, the parties to a statutory appraisal action cannot voluntarily settle such a proceeding without the approval of the Court of Chancery. 8 *Del.C.* § 262(k); *see also Raynor v. LTV Aerospace Corp.,* Del.Ch., 317 A.2d 43, 44 (1974). Second, in reviewing the parties' voluntary settlement of a statutory appraisal proceeding the Court of Chancery may condition its approval "upon such terms as the Court [of Chancery] deems just." 8 *Del.C.* § 262(k).

■ In this case, the parties' agreement to compromise a statutory appraisal action was presented to the Court of Chancery in the context of the Belzbergs' motion for specific performance. The Court of Chancery concluded that the settlement was unfair to ENSTAR since it would result in an unintended double payment to the Belzbergs for their shares. Therefore, the Court of Chancery arguably "conditioned" its approval of the parties' settlement agreement by requiring the Belzbergs to deduct the merger consideration they had already received from the settlement consideration. This "condition" was acceptable to the Belzbergs.

Notwithstanding the Belzbergs' acquiescence, the Court of Chancery was not authorized to substantially modify the parties' agreement in the guise of imposing "just terms" as a condition of its approval. *Hughes v. United States,* 342 U.S. 353, 356, 72 S.Ct. 306, 308, 96 L.Ed. 394 (1952). In an analogous situation, the United States Supreme Court has said:

> Consent decrees [settlement agreements] are entered into by parties to a case after careful negotiation has produced agreement on their precise terms. The parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation. Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation. Thus the decree [settlement agreement] itself cannot be said to

have a purpose; rather the parties have purposes, generally opposed to each other, and the resultant decree [settlement agreement] embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve. *For these reasons, the scope of a consent decree [settlement agreement] must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it.*

*United States v. Armour & Co.,* 402 U.S. 673, 681–682, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971) (emphasis added) (footnote omitted). *See also United States v. Atlantic Refining Co.,* 360 U.S. 19, 79 S.Ct. 944, 3 L.Ed.2d 1054 (1959); *Hughes v. United States,* 342 U.S. 353, 72 S.Ct. 306, 96 L.Ed. 394 (1952).

The fact that the Final Order of the Court of Chancery might arguably effectuate a "fair" resolution of the statutory appraisal action did not warrant it in substantially changing the terms of the parties' agreement. *United States v. Atlantic Refining Co.,* 360 U.S. 19, 79 S.Ct. 944, 3 L.Ed.2d 1054 (1959). This Court has consistently held that there is no basis for expanding the limited remedy which is provided for in the appraisal statute by the invocation of equitable principles. *Alabama–By–Products Corp. v. Neal,* Del. Supr., 588 A.2d 255, 258 (1991); *Cede & Co. v. Technicolor, Inc.,* Del.Supr., 542 A.2d 1182, 1187 (1988); *Rabkin v. Philip A. Hunt Chem. Corp.,* Del.Supr., 498 A.2d 1099, 1106 (1985); *Weinberger v. UOP, Inc.,* Del.Supr., 457 A.2d 701, 714 (1983). Similarly, the provision in the appraisal statute which gives the Court of Chancery authority to impose "just terms" as a condition of its approval of a statutory appraisal proceeding, does not give it authority to reform a settlement agreement that was premised upon a unilateral mistake.

### Conclusion

Having concluded that it would be "unconscionable" to specifically enforce the agreement the parties had reached, because it would have resulted in a double payment to the Belzbergs, the Court of

Chancery had no common law or statutory authority to impose an agreement upon the parties, notwithstanding the Belzbergs acquiescence in its terms. When the Court of Chancery concluded that it would be inequitable to specifically enforce the parties' agreement, due to ENSTAR's unilateral mistake, the contract should have been rescinded, not reformed. In the absence of an enforceable settlement agreement, the Belzbergs' demand for a statutory appraisal of their shares should proceed.

The final judgment of the Court of Chancery, in favor of the Belzbergs, is RE-VERSED. Given this disposition, the Belzbergs' cross-appeal from the judgment which denied their application for attorneys fees is moot. This matter is remanded for further proceedings in accordance with this opinion.