# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| KNOTT PARTNERS L.P., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2021-0583-SG |
| | ) | |
| TELEPATHY LABS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |

## <u>MEMORANDUM OPINION</u>

Date Submitted: November 4, 2021
Date Decided: November 23, 2021

Neal C. Belgam, Jason Z. Miller, and Michael C. Wagner, of SMITH, KATZENSTEIN & JENKINS LLP, Wilmington, Delaware; OF COUNSEL: Christopher M. Caparelli, of TORYS LLP, New York, New York, *Attorneys for Plaintiff Knott Partners L.P.*

Thomas G. Macauley, of MACAULEY LLC, Wilmington, Delaware; OF COUNSEL: Euripides D. Dalmanieras, of FOLEY HOAG LLP, Boston, Massachusetts, *Attorneys for Defendant Telepathy Labs, Inc.*

**GLASSCOCK, Vice Chancellor**

Generally, in considering a demand for books and records under Section 220 of the Delaware General Corporation Law by an individual purporting to be a stockholder-of-record,[1] a corporation may rely on its stock ledger to determine whether the demanding party is a stockholder and thus has standing under the statute. This is a salutary rule, permitting the corporation an easy reference for determining whether an individual purporting to be a stockholder-of-record is such. Section 220 is a statutory summary proceeding, and forcing litigants into the position of submitting extrinsic evidence of stockholder status would be a goad to inefficiency generally incompatible with such an action. In the unusual case before me, however, the corporation was aware of the status of Knott Partners L.P., the Plaintiff, as a stockholder, but failed to acknowledge that fact on its stock ledger. It seeks to rely on that deficient stock ledger to achieve a dismissal, and to put the Plaintiff to the expense of a new demand and complaint. In these narrow circumstances, I find that the Plaintiff has fulfilled its statutory duty to establish it was a stockholder as of the time of demand.

---

[1] 8 *Del. C.* § 220. As amended in 2003, the Section also permits beneficial holders to seek corporate records in their own names. *Id.* § 220(a)(1); S.B. 127, 142nd Gen. Assemb., Reg. Sess. (Del. 2003).

# I. BACKGROUND

In order to successfully seek corporate records under Section 220, a plaintiff must demonstrate that it is a stockholder.[2] This is a post-trial Memorandum Opinion regarding that predicate standing issue only. The record created at trial and the pre-trial briefing go in some instances beyond the facts necessary to a determination of stockholder status. The facts presented below are limited to those necessary to answer the question of the Plaintiff's status as a stockholder as of the date of the Section 220 demand (the "220 Demand").

## A. Factual Overview[3]

### 1. The Note Purchase Agreement and Facts Regarding Conversion

In the summer of 2019, the Plaintiff was considering the purchase of convertible notes from Telepathy Labs, Inc. (the "Defendant").[4] On August 30, 2019, to facilitate the sale, the then-chairman of the Defendant sent the Plaintiff an email, providing a Note Purchase Agreement (the "NPA") investment package.[5] Attached to that same email was a "Series Seed-3 enrollment package," which included a form of Series Seed-3 Preferred Stock Investment Agreement (the

---

[2] *See* 8 *Del. C.* § 220.

[3] Where the facts are drawn from exhibits jointly submitted at trial, they are referred to according to the numbers provided on the parties' joint exhibit list and, where needed, with page numbers derived from the stamp on each JX page ("JX __, at __").

[4] *See* JX 4 (note purchase agreement solicitation package); *see also* Pl.'s Verified Am. And Suppl. Compl., Dkt. No. 11; Def.'s Opp'n Pl.'s Renewed Mot. for Expedited Proceedings, ¶ 19, Dkt. No. 15 [hereinafter "Amended Compl."].

[5] *See* JX 43.

"Investment Agreement"), to be applicable upon conversion of the notes.[6]  The form was undated except for the year, provided as "2017."[7]

Shortly thereafter, on September 5, 2019, the Plaintiff purchased $2 million in convertible notes from the Defendant, under the NPA.[8]  Section 3.5(b) of the NPA reads as follows:

> Upon Maturity.  In the event that any principal or interest under any of the Notes remains outstanding on the Maturity Date, all outstanding principal and interest on any such Note shall automatically convert into that number of shares of the Company's Series Seed-3 Preferred Stock . . . .  The Purchasers agree in connection with the conversion of the Notes in accordance with this Section 3.5(b) to execute a Series Seed-3 Preferred Stock Investment Agreement in the form entered into by the Company and the holders of Series Seed-3 Preferred Stock.[9]

"Maturity Date" is defined in the NPA as "twenty-four (24) months following the initial closing."[10]  "Initial closing" is not defined.[11]  One other investor closed an NPA with the Defendant on June 20, 2019, leading (assuming that closing was an

---

[6] See id.

[7] Id., at PX3.0012 ("'Agreement Date' means [_____], 2017.").

[8] JX 5.

[9] Id., § 3.5(b).

[10] See id., § 3.1.  The definition specifies that the Maturity Date will occur on the earliest of three separate events, but no party argued at trial that either of the two alternative events was controlling. See id.

[11] See generally JX 5.

"initial closing") to a Maturity Date of June 20, 2021.[12] Thus, the Plaintiff proceeded as if June 20, 2021 were its Maturity Date, despite the lack of clarity in the NPA.[13]

In anticipation of its note conversion on June 20, 2021, the Plaintiff returned to the Defendant, on June 18, 2021, the enrollment package the Defendant had provided previously (the "June 18 Delivery"), executed by the Plaintiff.[14] This delivery included a signed but undated copy of the Investment Agreement as received in August 2019.[15] The Plaintiff avers that it believed that the NPA made the conversion of its notes into stock "automatic," as specifically provided in the NPA.[16]

On June 23, 2021, the Defendant acknowledged the June 18 Delivery (the "June 23 Letter"), but instead of confirming that the conversion had occurred on June 20, the Defendant offered the Plaintiff the opportunity to convert its notes into Series A (rather than Series Seed-3) shares.[17] The June 23 Letter identified June 28, 2021, as the deadline for the Plaintiff to confirm whether or not it wanted its notes

---

[12] *See* JX 3, at KP-TL000603 (side letter with investor referencing an NPA between the parties "dated on or about the date hereof," June 20, 2019).

[13] JX 57, ¶ 39. The Plaintiff, for reasons unclear to me, at trial attempted to establish its standing as a stockholder as of the earlier initial closing date of March 29, 2021. *See, e.g.*, Pl.'s (Am.) Opening Trial Br. Section 220 Claim 8, Dkt. No. 67. I need not reach this issue, for I find that the Plaintiff was a stockholder as of the date of its demand on June 28, 2021.

[14] *See* JX 43.

[15] *Id.*, at PX3.0030.

[16] *See id.*, at PX3.0001 ("Since our notes automatically convert on (or before) June 20[th], we have gone ahead and filled out the enrollment packaged provided to us . . . upon the closing of our investment in 2019.").

[17] JX 44, at PX7.0001.

4

converted into Series Seed-3 shares.[18] The June 23 Letter also stated that if the Plaintiff did not answer the letter in writing by June 28, the Defendant would "interpret [the Plaintiff's] silence as confirmation that Knott Partners wants its note converted into Series Seed-3 shares. The Company calculates that as of June 28, 2021 . . . . The [Plaintiff's] investment amount would be converted into 513,199 Series Seed-3 shares."[19]

### 2. The 220 Demand and Facts Thereafter

The Plaintiff served its 220 Demand on the Defendant on June 28, 2021.[20] That same communication also confirmed in writing that the Plaintiff considered itself a stockholder of Series Seed-3 Preferred Stock as of June 20, 2021, and was no longer in a position to determine whether to convert into Series A Preferred Stock.[21]

Prior to receiving the Defendant's response, the Plaintiff filed its original complaint in this matter on July 8, 2021.[22]

The Defendant answered the 220 Demand on July 15, 2021, stating that "[i]n order to complete the conversion" of the Plaintiff's notes into stock "in accordance

---

[18] *Id.* ([W]e request that you confirm, in writing, by not later than 5 p.m. on Monday, June 28, 2021, whether Knott Partners does, in fact, want its note converted into Series Seed-3 shares . . . .").
[19] *Id.*
[20] *See* JX 45.
[21] *See id.*, at PX33.0001.
[22] Pl. Knott Partners L.P. Books and Rs. Verified Compl. Against Def. Telepathy Labs, Inc., Dkt. No. 1 [hereinafter "Compl."]; *see also* JX 47.

5

with paragraph 3.5(b)" of the NPA, the Plaintiff would need to sign a joinder agreement to the Investment Agreement (provided as part of that same email).[23] The proffered joinder agreement does not appear to have been attached to the original Series Seed-3 enrollment package, is not discussed in the body of that email, and is not referenced in the text of the Investment Agreement itself as a requirement for the vesting of stock.[24]

The Plaintiff refused to sign the joinder agreement on July 16, 2021, considering it unnecessary given the Plaintiff's view that conversion had already occurred.[25] Additional correspondence traded between counsels clarified the Defendant's position that the Plaintiff lacked standing under Section 220 to make the 220 Demand on June 28, 2021.[26]

On August 5, 2021, the Defendant's sole director executed a written consent of sole director (the "August 5 Consent").[27] Attached to that consent as an exhibit was a proposed amendment to the NPA to be distributed to "Acting Noteholders."[28] That amendment, though in draft form, stated that the Plaintiff's note "*was* converted

---

[23] JX 51, at PX35.0001.
[24] *See generally* JX 43; *see also id.*, at PX3.0011–PX3.0030.
[25] *See, e.g.*, JX 53, at PX36.0002 (questioning why the Plaintiff would join an agreement to which it was already a party).
[26] *See, e.g.*, JX 54, at PX37.0002.
[27] JX 56.
[28] *Id.*, at KP-TL000940.

into 513,199 shares of Series Seed-3 Preferred Stock of the Company effective *as of* [June 28, 2021]."[29]

*B. Procedural History*

As above, the original complaint in this matter was filed along with a motion to expedite on July 8, 2021.[30] An amended and supplemented complaint was filed on August 10, 2021, and the Defendant opposed the Plaintiff's motion for expedited proceedings on August 16, 2021.[31] The operative complaint seeks both Section 220 inspection rights as well as contractual inspection rights.[32] As such, the motion to expedite was granted with respect to the Section 220 rights only on August 26, 2021; discovery and motion practice followed.[33] Trial regarding the Section 220 rights was held on November 4, 2021.[34]

## II. ANALYSIS

Achieving standing under Section 220 requires that a plaintiff "first establish that: (1) [s]uch stockholder is a stockholder; (2) [s]uch stockholder has complied with [Section 220] respecting the form and manner of making demand for inspection

---

[29] *Id*. (emphasis added). For the avoidance of doubt, the bracketed date of "June 28, 2021" is bracketed in the original. *Id.*
[30] Compl.
[31] Amended Compl.
[32] *See generally id.*
[33] Tr. 8-26-2021 Telephonic Hr'g and Ruling of the Court regarding Pl.'s Mot. Expedited Proceedings, Dkt. No. 31.
[34] Tr. 11-14-2021 of Section 220 Trial, Dkt. No. 76 [hereinafter "Trial Tr."].

of such documents; and (3) [t]he inspection such stockholder seeks is for a proper purpose."[35]

This Memorandum Opinion deals solely with the threshold question of whether the Plaintiff was a stockholder as of the 220 Demand, that is, June 28, 2021.

*A. Stockholder as Holder of Record under Section 220*

Section 220 defines stockholder as "a holder of record of stock in a stock corporation, or a person who is the beneficial owner of shares of such stock held either in a voting trust or by a nominee on behalf of such person."[36]  The Plaintiff here contends that it is an owner of record.[37]

A brief contextualization of Section 220 is helpful in assessing the instant question.  A stockholder's right to inspect the books and records of a corporation was a common law right under Delaware law prior to the enactment of Section 220.[38]  As the statute is in derogation of common law, it must be strictly construed.[39]  I also remain mindful of the need to retain "consistency and established reliability" in the interpretation of Section 220.[40]

---

[35] 8 *Del. C.* § 220(c).
[36] *Id.* § 220(a)(1).
[37] Trial Tr., 43:8–10.
[38] *Rainbow Nav., Inc. v. Pan Ocean Nav., Inc.,* 535 A.2d 1357, 1359 (Del. 1987).
[39] *See id.* at 1359 ("The right to examine the corporation's stock ledger is hollow, indeed, if it can be defeated by never maintaining [the stock ledger.]  If the common law right of a stockholder to examine a corporation's books can only be diminished by legislation . . . the statutorily guaranteed right . . . cannot be frustrated by nonfeasance.").
[40] *Shaw v. Agri-Mark, Inc.*, 663 A.2d 464, 470 (Del. 1995).

Caselaw determining who is a stockholder or a holder of record under Section 220 generally relies on the corporation's existing stock ledger, as "Delaware courts require strict adherence to the [S]ection 220 inspection demand procedural requirements."[41] "[A] stockholder's right to inspection is status-related."[42] As such, "a corporation may rely on its stock ledger in determining which stockholders are eligible to vote or exercise the important rights of a stockholder," including the right to inspection under Section 220.[43]

Against that background, Section 220(c) states that "[t]he Court of Chancery is hereby vested with exclusive jurisdiction to determine whether or not the person seeking inspection is entitled to the inspection sought."[44] "[T]he Court of Chancery, in making its determination of a person's status as a stockholder of record, 'is empowered to examine all pertinent evidence with the view of reaching a determination of where justice lies.'"[45] Prudently, the Court seldom uses this

---

[41] *See Jacob v. Bloom Energy Corp.*, 2021 WL 733438, at *4 (Del. Ch. Feb. 25, 2021) (quoting *Cent. Laborers Pension Fund v. News Corp.*, 45 A.3d 139, 145 (Del. 2012)).

[42] *Shaw*, 663 A.2d at 467 (citing *State ex rel. Richardson v. Swift,* 30 A. 781, 783 (Del. Super. 1885)).

[43] *Id.* at 469 (citing *Ala. By-Products v. Cede & Co.*, 657 A.2d 254, 262–63 (Del. 1995); then citing *Preston v. Allison*, 650 A.2d 646, 649 (Del. 1994); then citing *In re ENSTAR*, 604 A.2d 404, 412 (Del. 1992); then citing *Enstar Corp. v. Senouf,* 535 A.2d 1351 (Del. 1987); then citing *Rainbow*, 535 A.2d at 1359–60; then citing *Am. Hardware Corp. v. Savage Arms Corp.*, 136 A.2d 690 (Del. 1957); then citing *Salt Dome Oil Corp. v. Schenck*, 41 A.2d 583, 589 (Del. 1945)).

[44] 8 *Del. C.* § 220(c).

[45] *Rainbow*, 535 A.2d at 1359 (quoting *In re Canal Constr. Co.*, 182 A. 545, 548 (Del. Ch. 1936)).

authority, occasionally acknowledging its existence but typically declining to inquire beyond the ledger itself.[46]

One exception to the stock ledger standard has been recognized to date: a court may look outside the stock ledger to extrinsic evidence "where the stock ledger is either blank or nonexistent."[47] The Delaware Supreme Court has previously found it "implicit in Sections 219 and 220 that Delaware corporations have an affirmative duty to maintain a stock ledger."[48] Only if a corporation fails in that duty may a court "look to extrinsic evidence in deciding whether a party possesses record stockholder status."[49]

Prudence demonstrates that any expansion of the interpretation of "holder of record" must be undertaken with solemnity. However, in the circumstances before

---

[46] *See, e.g.*, *W. Air Lines, Inc. v. Kerkorian,* 254 A.2d 240, 242 (Del. 1969).

[47] *Shaw*, 663 A.2d at 470 (citing *Rainbow*, 535 A.2d at 1361). *Rainbow* examined the language of the then-current Section 219(c), which stated that "[t]he stock ledger shall be the only evidence as to who are the stockholders entitled to examine . . . *the books of the corporation.*" *See Rainbow*, 535 A.2d at 1359 (emphasis added) (citing 8 *Del. C.* § 219(c)). This italicized language was removed in 2003, and Section 220(a), defining the term "stockholder," was simultaneously expanded to include beneficial owners in addition to holders of record. *See* S.B. 127, 142nd Gen. Assemb., Reg. Sess. (Del. 2003). While *Rainbow* purported to limit its holding "only" to situations where the corporation in question did not have a stock ledger or had an entirely blank stock ledger, it does not preclude the result here, as the language it examines has since been amended, and the legislature has expanded the universe of appropriate considerations in determining who constitutes a stockholder of record. *See Pogue v. Hybrid Energy, Inc.*, 2016 WL 4154253, at *4 (Del. Ch. Aug. 5, 2016).

[48] *Rainbow*, 663 A.2d at 1359 (citing *Bryan v. W. Pac. R.R. Corp.*, 35 A.2d 909, 914 (Del. Ch. 1944)).

[49] *Shaw*, 663 A.2d at 470 (citing *Rainbow*, 535 A.2d at 1361).

10

me, I find that an examination beyond the ledger, given the specific facts of this case, is necessary to serve the interests of equity.

The Defendant has acknowledged in writing that the Plaintiff's notes converted no later than June 28, 2021—both in its counsel's June 23 Letter and in its August 5 Consent. I find as a matter of fact that these statements, made both to the Plaintiff and to an external audience of "Acting Noteholders," are concessions on behalf of the Defendant that the Plaintiff was, in fact, a stockholder as of June 28, 2021. The Defendant takes the position, however, that because it failed to update its stock ledger accordingly[50]—presumably because it insisted on the Plaintiff executing a joinder agreement that was not identified as necessary under the NPA, the Investment Agreement, or the enrollment package—it need not treat the Plaintiff as a stockholder for Section 220 purposes.[51] It acknowledges that the Plaintiff is now listed on the stock ledger, and argues that this 220 action should be dismissed, and a new mirror-image 220 demand then be refiled by the Plaintiff, if desired.[52]

The Defendant's late-in-the-game attempt to require the Plaintiff to execute a joinder before recognizing the conversion of notes to shares does not excuse its failure to update its records[53] to denominate the Plaintiff as a record holder of its

---

[50] *See, e.g.*, Trial Tr. at 54:16–22; *see id.* at 58:14–17 ("We don't dispute that [Knott Partners are] stockholders. We dispute that they were stockholders of record as of June 28.")
[51] *See id.* at 55.
[52] *Id.* at 50.
[53] See 8 *Del. C.* § 219(c) ("stock ledger" is "1 or more records . . . of the corporation in which the names of all the corporation's stockholders of record . . . are recorded . . . .")

stock. First, this purported condition would read the term "automatically" out of the plain language of Section 3.5(b) of the NPA, which indicates that the notes will *automatically convert* at the Maturity Date—*i.e.*, conversion will occur without other action.[54] The Defendant's interpretation renders the word "automatically" a nullity. Further, in the event the provision of an Investment Agreement was necessary to the conversion—and I do not find that it was—the Plaintiff returned the executed form copy of the Investment Agreement in a timely fashion predating June 20 (and June 28). The terms of the Investment Agreement itself do not contemplate that a joinder is necessary to be added as a new investor, and the NPA only requires the Plaintiff to "execute" the Investment Agreement—not a joinder thereto.[55] Again, the Defendant itself concedes that the Plaintiff was in fact a stockholder as of the demand date.[56] In concert with the Defendant's concession, I do not find that the joinder acts as a precondition to conversion. I find by clear and convincing evidence that the Plaintiff was a stockholder at the time of the demand, and that the Defendant knew the stockholder was a stockholder as of that date.

There is great value in allowing corporations to rely on the stock ledger in responding to purported demands by record stockholders under Section 220. Any wholesale departure from this rule would involve great potential for mischief and

---

[54] JX 5, § 3.5(b).
[55] *See generally* JX 5.
[56] *See* JX 44; JX 56.

inefficiency. It would, moreover, be incompatible with the required strict reading of the statute. These considerations cannot amount to a license for corporations to manipulate their stock ledgers to frustrate inspection rights, however. Where the ledger is non-existent, or blank, therefore, extrinsic evidence may be sufficient to demonstrate a stockholder was a stockholder at the time of demand.[57] Similarly, I find, where a corporation has failed to update its stock ledger to reflect a new stockholder on a date certain, but is otherwise aware of the *bona fides* of the stockholder's status as of that date, *and concedes in documentation circulated outside the corporation that the same entity was in fact a stockholder as of that date*, that corporation cannot rely on the deficient stock ledger to deprive the stockholder of its inspection rights under Section 220.

Here, I find that the Defendant corporation was aware of the Plaintiff's status as a stockholder on the demand date, and I find that the Plaintiff was a stockholder for purposes of Section 220 as of June 28, 2021, the date of the 220 Demand.

### III. CONCLUSION

The Plaintiff's standing as a stockholder as of the date of the 220 Demand is confirmed. Having decided the predicate issue of stockholder status, the parties are directed to meet and confer and inform me of what, if any, issues remain.

---

[57] *Shaw*, 663 A.2d at 470 (citing *Rainbow*, 535 A.2d at 1361).